In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 12-3680, 12-3683, 12-3747, 13-1374 & 13-2321

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT CARDENA, TONY SPARKMAN, JORGE URIARTE,
HECTOR URIARTE, and GLENN LEWELLEN,

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 CR 0332 — **Joan B. Gottschall**, *Judge.*

———————————

ARGUED DECEMBER 11, 2015 — DECIDED NOVEMBER 18, 2016

———————————

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Chicago Police Department officer Glenn Lewellen arrested drug dealer Saul Rodriguez in 1996 and eventually turned him into an informant. By 1998, the two had established a more lucrative arrangement: Rodriguez would collect information about local drug dealers, and then Lewellen would make a seemingly legitimate detention of the dealers and rob them of their drugs and money.

Over the next several years, Rodriguez and Defendant Lewellen ran a successful criminal enterprise, bringing in at least thirteen more participants, including Defendants Hector Uriarte ("Hector"), Jorge Uriarte ("Jorge"), Tony Sparkman, and Robert Cardena. Robbing drug dealers eventually escalated into kidnapping them for ransom money or even murdering them for money and drugs.

Although several of the members arranged plea agreements, six of the organization's members were tried, and five were convicted. They appealed, challenging various aspects of their convictions, and we affirm. In addition, Defendants Hector, Jorge, and Sparkman challenge their sentences. We vacate those sentences and remand for resentencing in light of *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

## I. BACKGROUND

This case involves an extensive cast of characters engaging in numerous criminal acts. The conspiracy's collapse resulted in the indictment of at least fifteen individuals and a three-month jury trial for six Defendants. Despite the complexity of the conspiracy, investigation, and trial, each issue raised on appeal has a discrete set of relatively simple facts. For that reason, we will lay out the facts relating to a particular claim at the time it is discussed. Before turning to Defendants' arguments, however, we offer a brief description of the crimes that brought us here.

In 1996, Chicago Police Department ("CPD") officer Glenn Lewellen arrested Saul Rodriguez for marijuana distribution, and Rodriguez agreed to become an informant. Rodriguez was not the typical informant, however, because by 1998, his information on area drug dealers was no longer being used

for law-enforcement purposes. Instead, Rodriguez would identify drug dealers for Lewellen, and Lewellen—sometimes with help from Rodriguez—would rob them. Often, Lewellen would pretend to conduct a traffic stop or arrest and would confiscate the dealers' drugs and money to share with Rodriguez.

The venture was profitable, and it evolved to include more members and more violent crimes to further the venture. Between 1998 and 2009, members of the conspiracy committed at least three murders, twenty kidnappings and robberies, and numerous drug-trafficking offenses.

*A. Indictment*

The conspiracy came to an end in April 2009 when the Drug Enforcement Agency ("DEA") filmed an attempted robbery of 600 kilograms of cocaine from a warehouse. A lengthy prosecution followed.

The third superseding indictment, returned on January 13, 2011, alleged two conspiracies: (1) Count 1 alleged a racketeering conspiracy to commit murders, kidnappings, robberies, drug trafficking, and obstruction of justice ("RICO conspiracy") and (2) Count 13 alleged a conspiracy to possess with intent to distribute five or more kilograms of narcotics ("narcotics conspiracy"). Defendants were charged with both conspiracies, with the exception of Cardena who was only charged with participation in the narcotics conspiracy.

Along with conspiracy charges, Defendants were also charged for their individual participation in substantive offenses of the conspiracy. We briefly describe those relevant to this appeal.

In 2006, Defendants Hector, Jorge, Sparkman, and Cardena broke into a house in Joliet, Illinois, and stole several boxes containing 300 kilograms of cocaine ("Joliet robbery").

The Joliet cocaine belonged to a high-ranking member of the Mexican cartel. After the cocaine was stolen, the cartel hired Rodriguez to investigate. Rodriguez blamed rival drug dealers Lou Vega and Francisco Pizarro. Rodriguez, Hector, and Jorge kidnapped Pizarro and Vega and then bound, threatened, interrogated, and tortured them to convince the cartel that it had thoroughly investigated the cocaine theft ("Vega/Pizarro kidnapping").

In 2007, Hector, Jorge, Sparkman, and co-conspirator Andres Flores robbed Pedro Avila, who Rodriguez believed was hiding $2 million in cash in his home ("Avila kidnapping"). The group posed as police officers and used a battering ram to break into the home. The group threatened Avila, his wife, and children, and stole only $2,000. Defendants Hector, Jorge, and Sparkman were also charged with using firearms in connection with this offense.

In 2008, Hector, Jorge, Sparkman, and Flores kidnapped Jose Carranza and his friend ("Carranza kidnapping"). Hector served as lookout while Sparkman kicked in Carranza's door. Flores covered Carranza with a blanket and held a gun to his head, while Jorge did the same with Carranza's friend. The group found and stole only $2,000 in cash. Defendants Hector, Jorge, and Sparkman were also charged with using firearms during this offense.

In April 2009, the crew attempted to steal 600 kilograms of cocaine from a warehouse in Channahon, Illinois ("Channahon robbery"). The DEA filmed the robbery and arrested most of the co-conspirators at that time.

*B. Trial*

Six Defendants went to trial—Lewellen, Hector, Jorge, Sparkman, Cardena, and Manuel Uriarte. The government's case-in-chief spanned eleven weeks with more than 100 witnesses, including the testimony of cooperating co-conspirators Rodriguez, Flores, Fares Umar, Lisette and David Venegas, Jorge Lopez, Pedro Victoria, and Andres Torres.

On January 31, 2012, the jury returned its verdict. The jury acquitted Manuel Uriarte on two counts and could not reach a verdict on count 1; he subsequently pled guilty to count 1 and is not involved in this appeal. Defendants Lewellen, Hector, Jorge, Sparkman, and Cardena were each convicted on some or all of the charges against them, and they appeal.

*C. Sentencing*

Cardena and Lewellen, who do not challenge their terms of imprisonment, were sentenced to 120 months and 216 months, respectively. Because Hector, Jorge, and Sparkman were convicted of two 18 U.S.C. § 924(c) offenses each, they were subject to a mandatory minimum of 40 years' imprisonment. The district court sentenced Sparkman to the mandatory minimum of 504 months; Jorge to a below-guidelines sentence of 720 months; and Hector to a below-guidelines sentence of 600 months.

## II. ANALYSIS

We turn now to the issues raised in Defendants' appeals. Defendants raise numerous distinct issues on appeal arising from both their trial and sentencings.[1] We treat each issue in turn.

### A. Dismissal of Juror 24 for Cause

Defendants first challenge the district court's dismissal for cause of Juror 24.

During voir dire, the district court asked if any juror had ever been arrested. Juror 24 did not raise his hand. Later, a police officer, unbeknownst to the government, ran a criminal history check on Juror 24 and found that he had been arrested nine times. The district court then asked Juror 24 if he had ever been arrested, but he only disclosed one arrest for marijuana. The government then moved to dismiss Juror 24 for cause. The district court asked the government to confirm the accuracy of the criminal history report before it would grant the motion. The report was correct, so the district court dismissed Juror 24 for cause because of his false statements.

Generally, we review a district court's ruling on for-cause challenges to jurors for an abuse of discretion. *United States v. Fletcher*, 634 F.3d 395, 409 (7th Cir. 2011). We need not even consider whether the district court abused its discretion, however, because Defendants have not pointed to any legally cognizable harm. *See Marshall v. City of Chicago*, 762 F.3d 573, 578

---

[1] Several of the arguments raised apply to all Defendants. Where arguments apply to fewer than all Defendants, it will be indicated as needed.

(7th Cir. 2014) ("[E]ven quoting the standard of review is getting ahead of ourselves. [The defendant] has suggested no remotely cognizable legal harm to support this argument.").

There is "no legally cognizable right to have any particular juror participate in [a defendant's] case." *United States v. Polichemi*, 201 F.3d 858, 865 (7th Cir. 2000). We have repeatedly rejected the challenge Defendants raise, explaining:

> [The defendant's] argument that one prospective juror who did not sit on his jury *would* have been unbiased does not establish a violation of his constitutional rights to due process and an impartial jury; these rights are satisfied as long as a defendant is tried before a "qualified jury composed of individuals not challengeable for cause."

*United States v. Russell*, 463 F. App'x 585, 586–87 (7th Cir. 2012) (quoting *Rivera v. Illinois*, 556 U.S. 148, 157 (2009)); *see also United States v. Osigbade*, 195 F.3d 900, 905 (7th Cir. 1999).

Defendants' reliance on cases where a district court *denied* a for-cause challenge is misplaced because such a denial may have resulted in the seating of a juror who is actually partial, thereby affecting the impartiality of the jury. There are no such concerns where a for-cause challenge may have been mistakenly *granted*,[2] but the jury was otherwise impartial, which is the circumstance we face here.[3]

---

[2] That is not to say that the for-cause challenge was improperly granted in this case. We decline to address the merits of the district court's decision to remove Juror 24 for cause.

[3] Curiously, Defendants suggest that the harm they suffered was the deprivation "of a meritful challenge under *Batson v. Kentucky*, 476 U.S. 79

### B. Rereading the Silvern Instruction

Defendants next argue that the district court abused its discretion when it chose to reread the *Silvern* instruction instead of declaring a mistrial after the jury indicated that it was unsure if it could reach a verdict.

Before deliberating, the jury was read a modified version of the instruction[4] this court promulgated in *United States v. Silvern*, 484 F.2d 879 (7th Cir. 1973) (en banc).

---

(1986), to the Government's eventual use of a peremptory strike to remove Juror 24 from the jury." (Hector Br. 27 n.2.) But Defendants cite no authority for such a proposition, likely because we have rejected just such an argument. *See United States v. Taylor*, 509 F.3d 839, 849 (7th Cir. 2007) ("The defendants' argument rests on pure speculation—they merely suspect that the government would have exercised a peremptory challenge against [the juror] had its challenge for cause been denied. Moreover, *Batson* prohibits the use of peremptory challenges in a discriminatory fashion; it does not require a district court to deny challenges for cause with respect to African-American potential jurors just to guarantee the defendants the *opportunity* to raise a *Batson* challenge.").

[4] The instruction, based on Seventh Circuit Pattern Instruction § 7.03, provided:

> You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to reexamine your own views and change your opinion if you come to believe it is wrong, but you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of your fellow jurors or for the purpose of returning a unanimous verdict.

After twenty-three hours of deliberation, the district court received a note from the jury that said: "Dear Judge, we have been talking about all the evidence, and unfortunately believe that there are some counts we can't agree on. What might our next step be? We have voted, discussed, voted over and over again. Some of us stand very strong in our opinions." (Trial Tr., vol. 32,[5] 5432.) In light of the note from the jury, Defendants moved for a mistrial, but the government requested that the district court reread the *Silvern* instruction instead.

During the discussion about the jury's note, the district court disclosed that the previous day a court security officer had told the court that "one of the jurors [was] near tears because she's afraid she's going to lose her job if these deliberations don't come to an end." (*Id.* at 5433.) The court instructed the officer to tell the jury that if there is "any juror who needs me to deal with an employer, they should bring their concerns to me." (*Id.* at 5441.) No juror approached the court.

The defense requested, and the district court agreed, to take this fact into consideration when deciding whether to reread the *Silvern* instruction. The district court found it appropriate to reread the instruction instead of declaring a mistrial.

We review a district court's decision to read (or reread) the *Silvern* instruction for an abuse of discretion. *United States v. Sanders*, 962 F.2d 660, 676 (7th Cir. 1992). The *Silvern* instruction may be reread "to the jury after deliberations reach a deadlock, provided that a supplemental instruction is

---

(Trial Tr., vol. 30B, 5475.)

[5] An error occurred in the consecutive pagination of the trial transcripts, so there are duplicates of pages 5423–89. Where there are duplicate page numbers, the volume number will be used to distinguish them.

deemed necessary." *United States v. Collins*, 223 F.3d 502, 509 (7th Cir. 2000) (internal quotation marks omitted). At bottom, "[t]he relevant inquiry, under *Silvern*, … is whether the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir. 1992) (internal quotation marks omitted).

The content of the instruction is not inherently coercive. *Sanders*, 962 F.2d at 676; *United States v. Beverly*, 913 F.2d 337, 352 (7th Cir. 1990). But, Defendants argue, it was the context in which the instruction was reread that led to coercion. In this case, the jury sent one deadlock note after only three days of deliberation in a trial that had lasted eleven weeks and had six Defendants and more than 100 witnesses. In such a situation, the district court did not abuse its discretion in rereading the *Silvern* instruction. *See, e.g.*, *Sanders*, 962 F.2d at 665–66, 676 (no error in two rereadings of *Silvern* instruction after two-month, multi-defendant trial where jury had only deliberated for two days but one juror was refusing to participate).

In addition, the jury did not return its verdict until five days after the court reread the *Silvern* instruction, and it did not convict all Defendants of all counts, indicating that re-reading of the instruction did not pressure jurors to "surrender their honest opinions for the mere purpose of returning a verdict." *Kramer*, 955 F.2d at 489 (internal quotation marks omitted).

With respect to the crying juror, it is quite speculative to infer that the juror felt coerced to agree. No juror came forward after the district court requested the jury be informed that anyone having trouble with an employer should discuss

the issue with the court. It is more likely that whatever frustration plagued that juror had been resolved, or else the district court would have been informed. Accordingly, the district court did not abuse its discretion in rereading the *Silvern* instruction.

Nor did the district court abuse its discretion in refusing to grant a mistrial. A district court has broad discretion to deny a motion for a mistrial, and we only review for an abuse of that discretion. *Beverly*, 913 F.2d at 351. Again, deliberations had only gone on for three days after a trial that had lasted almost three months. The jury had only sent one note to the court expressing its inability to agree. The district court responded appropriately by asking for jurors to come forward if there were problems with work and rereading the *Silvern* instruction to encourage further deliberation.

*C. Failure to Hold Hearing about Crying Juror*

Defendants, relying on *Remmer v. United States*, 347 U.S. 227 (1954), also contend that the district court abused its discretion when it did not hold a hearing to assess whether the crying juror's employment pressures were an extraneous jury influence that violated their right to a fair trial.

No Defendant requested a hearing to evaluate the upset juror's situation, nor did any Defendant object to the district court's solution, which was to request that any juror having trouble with work bring it to the court's attention. A failure to object, coupled with acquiescence in the district court's solution, could constitute waiver of a hearing. *See United States v. Verkuilen*, 690 F.2d 648, 658 (7th Cir. 1982) ("Defense counsel's

express acquiescence to the manner in which the court handled the jury taint question clearly amounts to a waiver of the issue.").

Even if not waived, our review is made particularly difficult in light of the fact that Defendants did not request a hearing. *See United States v. Walker*, 160 F.3d 1078, 1083 (6th Cir. 1998) ("[A] defendant who waits until appeal to request a [*Remmer*] hearing bears a heavy burden, since the defendant has thereby effectively deprived this court of any basis for concluding that a hearing would be necessary, and asks us to presume that the district court would not have acceded to such a request, and would have done so for erroneous reasons."). Defendants' claim that the district court erred in failing to sua sponte order a *Remmer* hearing cannot survive the heavy burden of plain-error review, which requires an error that is *plain* and affects the defendant's substantial rights. Fed. R. Crim. P. 52(b); *United States v. Marcus*, 560 U.S. 258, 262 (2010).

While it is true that extraneous influences on a juror can give rise to a violation of a defendant's right to an impartial jury, *Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir. 2005), not all extraneous influences are presumptively prejudicial such that they require a *Remmer* hearing. *See United States v. Warner*, 498 F.3d 666, 680 (7th Cir. 2007) ("Sometimes the circumstances are such that the *Remmer* presumption does not even apply.").

To invoke the *Remmer* presumption, "the extraneous communication to the juror must be of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury." *Wisehart*, 408 F.3d at 326. "How much inquiry is necessary (perhaps very little, or even none) depends

on how likely was the extraneous communication to contaminate the jury's deliberations." *Id.*

In the present case, any extraneous communication was not "of a character that creates a reasonable suspicion that further inquiry is necessary." *Id.* The juror was near tears because of concern about losing her job; nothing about the communication was related to the case or to influence a vote. This was not a "purposeful intrusion into the sanctity of the juror's domain" to which the *Remmer* presumption applies. *Schaff v. Snyder*, 190 F.3d 513, 534 (7th Cir. 1999). In addition, the district court relayed to the jurors that if there were problems with an employer, they should alert the district court. No juror came forward, indicating that any extraneous communication was no longer affecting the juror. And finally, the district court disclosed the situation and its solution to both parties, at which point Defendants did not request a hearing. Those facts are a far cry from *Remmer* where the extraneous communication was an offer to bribe a juror, and the court and prosecutor resolved the situation *ex parte*. 347 U.S. at 228–29.

*D. Government's Introduction of "False" Testimony*

Defendants Hector, Jorge, Sparkman, and Lewellen argue that the government knowingly introduced false testimony at trial, which warrants a new trial.

Because Defendants did not object at trial to the government's alleged presentation of knowingly false testimony, our review is for plain error. *United States v. Peak*, 856 F.2d 825, 830–31 (7th Cir. 1988).

Undoubtedly, it violates due process for the government to obtain a conviction by the knowing use of perjured testimony. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Schaff*, 190 F.3d

at 530. But, to receive a new trial, the defendant must show "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the jury." *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011).

### 1. Victoria's Testimony

Defendants first allege that Pedro Victoria gave testimony the government knew to be false regarding Hector's involvement in the Avila kidnapping and Delatorre robbery.

The false testimony at issue is Victoria's trial testimony that he gave the government information in January, November, and December 2008 that Hector was involved in the Avila kidnapping. But Officer Healy testified that he did not recall Victoria identifying the Uriartes as being involved until his grand-jury testimony in February 2010.

Thus, Victoria's "false" testimony relates to the *dates* on which he informed the government that Hector was involved in the Avila kidnapping. But, "[t]he alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001) (internal quotation marks omitted). The *date* on which Victoria told the government that Hector was involved in the Avila kidnapping has nothing to do with whether Hector was involved or not, and so any falsehood does not bear on Hector's guilt or innocence.

Rather, the argument that the government presented Victoria's false testimony appears to be an attempt to re-weigh the *credibility* of Victoria's testimony. Their contention is that when Rodriguez was placed in the Metropolitan Correctional

Center in February 2009 along with Victoria and other gov-
ernment witnesses, Rodriguez coerced or attempted to coerce
those witnesses to corroborate his story so that he could get a
better plea deal. But the jury was fully apprised of the fact that
Rodriguez had engaged in such conduct. Defendants cross-
examined Victoria extensively about the dates, and the jury
also heard Officer Healy's testimony that Victoria did not
identify Hector as involved until February 2010. Defendants
were able to argue to the jury the implication that Rodriguez
told Victoria to testify that Hector was involved, an implica-
tion it rejected by convicting Hector. "When a jury has chosen
to credit crucial testimony with full knowledge of the many
faults of the witness providing it, we have no basis to inter-
fere," *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996),
and we decline to do so here.

*2. Vega's and Rodriguez's Testimony*

Next, Defendants argue that the government presented
false testimony from either Rodriguez or Vega over whether
there was a dead body in the basement where Vega was held
during his kidnapping.

Vega's testimony was the following:

> Q: From where you were, you could see a dead male
> body on the floor of the basement?
>
> A: Yes.
>
> Q: You were able to look at that body for an hour or
> so because you were—while you were in the base-
> ment you were not blindfolded?
>
> A: Yes. …
>
> Q: Based on the clothes and the build of the body,
> you believed that the body was Mauricio's.

A: Yes.

(Trial Tr. 2474–75.)

Rodriguez, however, testified to the following:

> Q: … Let me ask you this: Was there a dead body on the floor by this body shop guy [Vega]?
>
> A: No.
>
> Q: Was there ever a dead body in Rogelio Corral's home?
>
> A: No. …
>
> Q: Was [Mauricio's] dead body lying on the floor of Rogelio Corral's home?
>
> A: There was no dead body.

(*Id.* at 3566–67.)

According to Defendants, one of the two had to be lying about whether there was a dead body, and therefore, the government knowingly presented false testimony.

But "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) (internal quotation marks omitted). The difference in testimony between the two witnesses as to whether Mauricio's dead body was in the basement does not establish that either's testimony was *deliberately false*, rather than a difference in personal knowledge or perception.

Vega only viewed the body for an hour from a distance during a stressful kidnapping. Rodriguez, on the other hand, denied that there ever was a dead body in the house. Perhaps there was an unconscious body or perhaps it was just a pile of

clothing that resembled a body. There are countless possibilities that could explain why the two witnesses had different recollections, and there is no evidence the government "knew" one of the witnesses' descriptions to be "false."

Even assuming—which is quite a large assumption—that the inconsistency between Rodriguez and Vega's testimony amounts to the government's knowing use of false testimony, the alleged perjured testimony does not relate to Defendants' guilt or innocence. *Shasteen*, 252 F.3d at 933. There was no charge in this case related to Mauricio's murder, so any "false testimony" that may have resulted over whether his dead body was in the basement has no bearing on whether a particular Defendant was involved in Vega's kidnapping. Defendants do not explain how the alleged "false testimony" about whether or not there was a dead body in the basement prejudiced them, and so we decline to grant a new trial on those grounds.

*E. Witnesses Brought to the Courtroom Window*

Defendants Hector, Jorge, Sparkman, and Lewellen next argue that a new trial should be granted because witnesses were brought to the courtroom window for purposes of making identifications prior to testifying in violation of Defendants' Sixth Amendment right to counsel.

During trial, Defendants learned that the government was having agents bring witnesses to the courtroom window to see if they could identify Defendants. Defendants brought the practice to the attention of the court. In response, the government said the practice had only been used for witnesses "who have had social and business relationships with these defendants for months and years." (Trial Tr. 2325.) The government

also disclosed that Salvador Hernandez, a witness who had not yet testified, was asked to look through the courtroom window and said he did not recognize anyone despite having previously identified the Uriartes in pictures.

The district court ordered that the practice stop. It also permitted the defense to cross-examine Hernandez about his inability to identify any Defendant through the window. Later, the government sent a letter to the defense in which it disclosed the witnesses who were asked to make identifications through the courtroom window. Defendants did nothing further with the information.

After the verdicts, Lewellen and Jorge moved for a new trial, arguing that the identifications violated due process. U.S. Const. amend. V. The district court, after a hearing, denied the motion.

Defendants did not raise the argument that the identifications violated their Sixth Amendment right to counsel until October 21, 2012. On that date, Jorge filed a post-trial "list of issues [Defendant] wishes to raise related to his trial and conviction." (R. 1051 at 1.) The list described the identification procedure and called it "an impermissible, post-indictment show-up. …" citing *United States v. Wade*, 388 U.S. 218 (1967), and *Gilbert v. California*, 388 U.S. 263 (1967). (*Id.* at 4.)

On appeal, Defendants appear to forfeit any argument that the procedure violated due process and only pursue the distinct argument that the identification violated the Sixth Amendment. Because Defendants did not make a contemporaneous objection on Sixth Amendment grounds, we will review for plain error. *See, e.g., United States v. Bell*, 624 F.3d 803,

808 (7th Cir. 2010) (plain-error review where argument on appeal "rests on different grounds").

The Sixth Amendment right to counsel requires the presence of counsel at any "critical stage of the prosecution." *Wade*, 388 U.S. at 237. There appears to be a circuit split on the question of whether permitting a witness to identify the defendant in the courtroom prior to testifying violates the Sixth Amendment. *Compare United States v. Roth*, 430 F.2d 1137, 1140–41 (2d Cir. 1970) (extending *Wade* to courtroom walk-through of witness) *and Cannon v. Alabama*, 558 F.2d 1211, 1217 (5th Cir. 1977) (applying *Wade* where officer asked witness to look through courtroom window), *with United States v. Montgomery*, 150 F.3d 983, 994–95 (9th Cir. 1998) (not extending *Wade* to identification through courtroom window because it was a "non-adversarial" identification not requiring assistance of counsel).

We decline to wade into the circuit split, however, because any error in allowing witnesses to look through the courtroom window to identify Defendants could not have prejudiced them because the witnesses had an "independent source" for their identification. *See Gilbert*, 388 U.S. at 272. The only witnesses that had testified by the time the government's practice was disclosed were co-conspirators or business associates who had repeated interactions with Defendants. The only *victim* that looked through the courtroom window, Hernandez, did not make an in-court identification and was cross-examined extensively about the courtroom-window practice. Therefore Defendants have not shown that they were prejudiced by any error the government committed by bringing witnesses to the courtroom window.

It does not go unnoticed that the government's practice of bringing witnesses to the courtroom window before testifying appears to be a subversion of the long-standing tradition that a witness identify the defendant in the courtroom on the witness stand in front of the jury and counsel.

In fact, in-court identifications are not subject to due-process concerns of suggestiveness *because* "the jury is in the unique position of observing the entire identification procedure, and it may weigh the accuracy of the identification accordingly." *United States v. Recendiz*, 557 F.3d 511, 526 (7th Cir. 2009). The government flouted that tradition by conducting in-court identification dress rehearsals without the procedural protection of the jury's and counsel's gaze. Nevertheless, we do not find that in this case the practice prejudiced Defendants or "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks omitted).

*F. Lewellen's Motion to Sever*

Before trial, Lewellen moved to sever his trial (or at least the murder-related counts) from the other Defendants, arguing that joinder was improper. Lewellen argued that because he did not participate or even know about the murders and did not have a relationship with the alleged murderers, he could not have "participated in the same act or transaction" with them. Fed. R. Crim. P. 8. In addition, he contended that he would be unfairly prejudiced by the government's introduction of evidence of murder because he was not alleged to have participated in murder. Fed. R. Crim. P. 14.

The district court denied Lewellen's motion on both grounds, concluding that because the government had alleged a RICO conspiracy, there was no requirement that every Defendant know each other or have personally participated in each act alleged.

At the close of evidence, Lewellen filed a motion alleging that the evidence was insufficient to sustain a conviction on the RICO counts and the narcotics conspiracy counts. Lewellen did not, however, renew his motion to sever at that time. After he was convicted of the narcotics conspiracy counts but not convicted of the RICO conspiracy, Lewellen raised the severance objection in a motion for a new trial, which the district court again denied.

We review a district court's denial of a motion to sever for an abuse of discretion. *United States v. Jackson*, 787 F.3d 1153, 1158 (7th Cir. 2015). A defendant, however, waives the issue if he does not renew his severance motion *at the close of evidence*. *Id.; see also United States v. Plato*, 629 F.3d 646, 650 (7th Cir. 2010) ("Failure to renew a motion to sever at the close of evidence results in waiver.").

Lewellen argues that because he raised the issue in a post-trial motion for a new trial, our review is for abuse of discretion. That is incorrect. The severance motion must be renewed at the close of evidence, *not* after the verdict. That is "because the close of evidence is the moment when the district court can fully ascertain whether the joinder of multiple counts was unfairly prejudicial to the defendant's right to a fair trial," while also "discouraging strategic choices by criminal defendants who would prefer to wait for a verdict before renewing their severance arguments, thus wasting valuable judicial

resources." *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002).

Importantly, Lewellen has not argued "that refiling [the motion to sever] would have been … futile," a situation in which waiver may be excused. *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) (alteration in original and internal quotation marks omitted). In fact, he offers no reason why he did not renew his severance motion at the close of evidence. Therefore, we conclude that he has waived the severance issue, precluding appellate review. *See Olano*, 507 U.S. at 733.

Even if Lewellen had not waived his claim for severance, the district court did not abuse its discretion in denying severance just because Lewellen did not personally participate in the alleged murders. Instead, "there is a presumption that participants in a conspiracy or other criminal schemes should be tried together, not only to economize on judicial and prosecutorial resources but also to give the jury a fuller picture of the scheme." *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001) (internal quotation marks omitted).

The indictment alleged that Defendants engaged in a long-running conspiracy involving drug trafficking, kidnapping, robbery, and murder. There was testimony at trial that Lewellen participated in drug trafficking and robbery in furtherance of the conspiracy. The fact that Lewellen did not personally participate in murder does not mean that the district court abused its discretion in permitting joinder. *See id.* at 387 (affirming joinder of the only defendant "not charged with committing a violent crime in aid of racketeering").

Lewellen has also not shown that his trial was in any way unfair as a result of the admission of murder evidence. In fact,

the jury could not reach a unanimous verdict on the RICO count—the charge to which the murder evidence was relevant. The verdict reinforces that the jury did as it was instructed and considered the evidence against Lewellen separately from other Defendants, resulting in a fair trial.

### G. Evidence of "Unexplained Wealth"

Defendants Hector and Lewellen challenge the government's reliance on a theory of unexplained wealth to introduce financial evidence against them.

### 1. Hector's Financial Evidence

During trial, Hector filed a motion in limine to prevent the government from introducing financial evidence. The government opposed the motion because it wanted to introduce evidence of his lavish spending on jewelry and luxury cars. The government indicated that it would introduce evidence of Hector's legitimate sources of income, including his tax returns from 2000 to 2009, a 2005 mortgage application, and a 2007 vehicle financing application.

The district court, relying on *United States v. Carrera*, 259 F.3d 818 (7th Cir. 2001), denied Hector's motion, ruling that evidence of his unexplained wealth was relevant and admissible, provided that the government introduce evidence "that the income was not obtained through legitimate means," which it noted could be shown by introduction of his tax returns.

As a result, the government introduced testimony that Hector received large amounts of cash from criminal activity, including drug sales and kidnapping ransoms. It also introduced testimony of several purchases and investments he

made between 2004 and 2008, including: (1) business invest-ments of $250,000, $50,000 of which was in cash; (2) a $280,000 mortgage with a cash down payment of $66,162; (3) vehicle purchases around $227,000; and (4) a diamond bracelet for $20,000 cash.

To comply with *Carrera*, the government presented the fol-lowing evidence that Hector's income was not obtained through legitimate means: (1) a 2005 mortgage application in which Hector represented that he owned Platinum Motors for three years, earning a monthly salary of $15,000 and (2) two 2008 vehicle financing applications in which he represented that he had been employed by Platinum Motors for five years, earning a monthly salary of $10,416.

But the owner of Platinum Motors, Roy Corral, testified that Hector had *never* worked there. He explained instead that Hector would invest cash in the business, and Corral would give him payroll checks because he "felt threatened if [he] didn't do so." (Trial Tr. 2834.) Coconspirator Andres Flores testified that Hector told him he had invested in Platinum Mo-tors as a way to "tell people he had a job, a legitimate one." (*Id.* at 2092.)

The government did not introduce Hector's tax returns. During closing argument, the government argued that Hec-tor's lavish spending was unexplained wealth and that the only explanation was his involvement in criminal activity.

After trial, Hector filed a motion for a new trial, challeng-ing the government's use of an unexplained-wealth argument because it had not introduced an objective financial picture via tax returns. The district court denied the motion, finding

that evidence that Hector was not employed at Platinum Motors was sufficient evidence that his income was illegitimate.

### 2. *Lewellen's Unexplained Wealth*

During trial, several witnesses testified that the organization would sell cocaine or get ransom money, and Lewellen would get a portion of the proceeds. The government then introduced evidence of Lewellen's large expenditures, emphasizing his use of large amounts of cash. Specifically, it introduced evidence that in 2006, Lewellen purchased four classic cars totaling $175,000, $145,000 of which was paid in cash. The witness testified that in his experience with the classic car market, he had never seen someone pay cash to make such a large car purchase.

To satisfy *Carrera*, the government presented some evidence of Lewellen's sources of income. Lewellen's former business associate testified that Lewellen told him that he had a $1 million workplace-injury settlement while at CPD. Lewellen's CPD record, however, does not mention any such settlement. The same associate testified that Lewellen told him that his wife had received a "couple million dollars" from an injury in an accident, but no evidence at all was offered to either prove or disprove that payment. (Trial Tr. 2694.)

Lewellen's case now diverges from Hector's because it is undisputed that he did have *some* legitimate income. The government presented evidence that Lewellen's salary as a police officer was never more than $61,512 from 1996 to 2002, which is when he left CPD.

Complicating matters further, however, is the fact that in 1999, Lewellen opened a homebuilding business. The government did not present evidence of the legitimate income that

Lewellen earned from that venture. It did, however, introduce limited testimony with respect to Lewellen's business, including that Lewellen Home Builders owned a $125,000 Hitachi excavator and that Lewellen provided a $1.2 million down payment to purchase land for a subdivision.

The government also elicited testimony about Lewellen's significant use of cash in his business, including: (1) Lewellen's purchase and resale of 70 home lots, after which he paid a finder's fee of $60,000 in cash; (2) Lewellen's use of $140,000 in cash, bound with rubber bands, to pay subcontractors; and (3) payments to subcontractors between 2001 and 2005, totaling approximately $44,000 in cash.

During closing argument, the government argued that Lewellen's use of more than $388,000 in cash to buy cars and pay contractors came from criminal activity, not from his modest salary as a police officer. It only once referred to the evidence as Lewellen's unexplained wealth. Lewellen never objected to the government's use of the financial evidence or its characterization of the financial evidence as unexplained wealth. He did, however, argue in closing that there was no "unexplained wealth" because he made all of the money through his legitimate business venture.

After the verdict, Lewellen filed a motion for a new trial, arguing that evidence of his financial situation was improperly admitted as "unexplained wealth" because the government did not offer evidence of the legitimate income he earned in his homebuilding business. The district court found that the financial evidence was improperly admitted under a theory of unexplained wealth, but concluded that because ev-

idence of large cash expenditures was independently admissible, Lewellen was not prejudiced by any improper argument.

### 3. *Analysis*

Defendants first argue that any evidence of unexplained wealth should have been excluded under Federal Rule of Evidence 404(b). Rule 404(b) excludes evidence of a "crime, wrong, or other act" if used to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," or in other words, if used as propensity evidence. Fed. R. Evid. 404(b)(1).

But Rule 404(b) does not apply to evidence that "relates to acts concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime." *United States v. Holt*, 460 F.3d 934, 937 (7th Cir. 2006) (internal quotation marks omitted). In such a case, the evidence is "part of the story of the very offense for which the defendant is on trial." *Id.* The financial evidence presented here is part and parcel of the circumstances surrounding the conspiracy crimes with which Defendants were charged, rendering 404(b) inapplicable.

Furthermore, evidence of other acts *is* admissible to prove motive, intent, or plan. Fed. R. Evid. 404(b)(2). The financial evidence here was not being used to show Defendants' propensity to spend lavishly or launder money in order to prove that they spent lavishly or laundered money on a different occasion. Instead, it is being used to show their *plan* to conceal the proceeds of criminal activity.

Next, we turn to the pertinent issue at hand: the *relevance* of the unexplained-wealth evidence. Evidence is "relevant" if

"it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). *Carrera* establishes that for unexplained-wealth evidence in drug cases to be "relevant" under Rule 401, the government must lay the foundation by meeting the following three requirements:

> (1) the evidence presented creates an inference that the defendant was involved in drug trafficking; (2) the unexplained wealth was acquired during the period in which the drug crime allegedly occurred; and (3) the government presents other evidence to support the charge, including evidence that the income was not obtained through legitimate means.

*Carrera*, 259 F.3d at 829.[6]

The third prong of *Carrera* stands for the proposition that evidence of wealth is not probative of involvement in criminal activity in the absence of evidence that the wealth could not have been earned legitimately (for when a billionaire buys a multi-million dollar home, no inference can be drawn that the money came from criminal activity). Instead, *Carrera* requires that to render the evidence relevant, the government must present evidence "that the income was not obtained through legitimate means." *Id.*

That means, however, that the relevance of unexplained-wealth evidence depends on a *fact*—namely, the "fact" that the income was not obtained through legitimate means. As Federal Rule of Evidence 104(b) explains: "When the relevance of evidence depends on whether a fact exists, proof

---

[6] Defendants do not appear to contest that the government satisfied prongs one and two of *Carrera*, so we do not address those prongs.

must be introduced sufficient to support a finding that the fact does exist."

This means that the district court must determine that sufficient evidence exists to find that the wealth was not derived from legitimate sources, but after that, the *jury* evaluates whether the fact exists.[7] Thus, in order to introduce evidence of unexplained wealth, the government must introduce sufficient evidence upon which a reasonable fact finder could conclude that the wealth was not from a legitimate source.

That does not mean that lack of a legitimate source of income must be *undisputed*. A dispute as to the legitimacy of the employment goes to the weight, not the admissibility of the government's unexplained-wealth evidence. *Cf. Carrera*, 259 F.3d at 829 (finding that where testimony about the defendant's employment was ambiguous, the district court did not

---

[7] The Advisory Committee Notes confirm this proposition:

> If preliminary questions of conditional relevancy were determined solely by the judge, … the functioning of the jury as a trier of fact would be greatly restricted and in some cases virtually destroyed. These are appropriate questions for juries. Accepted treatment, as provided in the rule, is consistent with that given fact questions generally. The judge makes a preliminary determination whether the foundation evidence is sufficient to support a finding of fulfillment of the condition. If so, the item is admitted. If after all the evidence on the issue is in, pro and con, the jury could reasonably conclude that fulfillment of the condition is not established, the issue is for them. If the evidence is not such as to allow a finding, the judge withdraws the matter from their consideration.

Fed. R. Evid. 104(b), 1972 advisory committee note to subsection (b).

"abuse[] its discretion in finding that the government had presented *at least some* evidence that the unexplained wealth was not derived from legitimate means." (emphasis added)).

*a. Relevance of Unexplained Wealth in Hector's Case*

Because Hector objected to the government's use of financial evidence and its corresponding unexplained-wealth argument, our review is for an abuse of discretion. *Id.* at 828.

The government produced sufficient evidence that Hector did not have a legitimate source of income. The government introduced evidence that on a mortgage application and vehicle financing applications, Hector represented that he worked at Platinum Motors. But the owner of Platinum Motors testified that Hector was not an employee, and that Hector merely withdrew a fraudulent paycheck so that it would appear that he had a legitimate job. That evidence is sufficient for a fact finder to conclude that Hector did not have legitimate income, making unexplained-wealth evidence relevant. It is then a question for the jury whether Hector's lavish lifestyle was the result of legitimate employment at Platinum Motors or of criminal activity.

Importantly, Hector does not argue on appeal that he had other legitimate sources of income that the government deliberately withheld. He only reasserts that he was an employee of Platinum Motors—which was disputed by the testimony at trial and properly left to the jury to evaluate.

Hector argues that the government did not satisfy the third prong of *Carrera* because it must present an objective financial picture with the defendant's tax returns and bank statements. Hector reads too much into the third prong of *Carrera*.

We have never said that there is a particular *type* of proof the government must use to show lack of legitimate income. *See, e.g.*, *Carrera*, 259 F.3d at 828–29 (testimony of the defendant); *United States v. Harris*, 536 F.3d 798, 811 (7th Cir. 2008) (testimony of the defendant's girlfriend), *overruled on other grounds by United States v. Corner*, 598 F.3d 411 (7th Cir. 2010); *United States v. Smith*, 308 F.3d 726, 737 (7th Cir. 2002) (tax records). Rather, the type of evidence used may bear on the *reliability* of the evidence—a question for the jury—not its admissibility. *Cf. Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) ("[S]tatutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial.").

As an aside, we are not even sure that introduction of Hector's tax returns would have been probative of the legitimacy of his income. Presumably Hector's tax returns would reflect the income he received from Platinum Motors' payroll. Reporting his Platinum Motors' income on a tax return does not transform his employment with that company from illegitimate to legitimate. Rather, Corral's and Flores's testimony was that Hector's employment was illegitimate and that he invested in Platinum Motors to force Corral into giving him paychecks to make his income appear legitimate. That factual dispute was for the jury to resolve, not for the district court to resolve when deciding whether evidence of unexplained wealth was admissible.

All this is to say that the district court did not abuse its discretion in admitting evidence of Hector's unexplained wealth, nor do we find any reason to believe that it abused its discretion in weighing the evidence under Rule 403 given

Hector's extensive wealth despite his lack of legitimate income.

*b. Relevance of Unexplained Wealth in Lewellen's Case*

Because Lewellen did not object to the admission of his financial evidence or the government's unexplained-wealth argument,[8] our review is only for plain error. *Carrera*, 259 F.3d at 828.

At issue, again, is the third prong of *Carrera*, which requires the government to present evidence that the income "was not obtained through legitimate means." *Id.* at 829. Lewellen's argument, however, is distinct from that of Hector because Lewellen undisputedly had some legitimate sources of income. The error comes from the government's failure to fully present the *extent* of his legitimate income.

There is no requirement that to rely on an unexplained-wealth theory, the defendant must have *no* source of legitimate income. But where a defendant does have a legitimate source of income, it follows that in order to rely on a theory of unexplained wealth, the government must present sufficient evidence upon which a jury could conclude that the defendant's wealth was inconsistent with his legitimate income.

---

[8] The district court did order that objections raised by co-Defendants applied to every other Defendant. Although Hector objected to evidence of his unexplained wealth, the objection was made *after* all of Lewellen's financial evidence had been admitted. In addition, Hector did not raise the specific factual argument advanced by Lewellen—that the government could not argue he had unexplained wealth because it did not prove the amount of *his* legitimate income. Therefore, Lewellen's specific objection was not preserved.

As an initial matter, the government does not have to disprove every theoretically possible source of income. In *Carrera*, the defendant's testimony that he was unemployed was sufficient to argue that the $928 in cash in his wallet was "unexplained wealth." *Id.* at 829. We did not require evidence that it was not the result of, say, an inheritance or settlement.

For that reason, we find no error in the government not disproving Lewellen's claim of a workplace-injury settlement or his wife's car-accident settlement. The only evidence of the existence of these sources of funds came from Lewellen's hearsay statements to an associate when asked where he got all of his money. Moreover, the government did present some evidence that Lewellen's workplace injury settlement was false because his CPD file made no mention of it. The jury had enough information to evaluate the reliability of the existence of that income, and we decline to impose a requirement that the government conclusively disprove them.

With respect to Lewellen's homebuilding business, however, the government did not present sufficient evidence to support an unexplained-wealth theory. In fact, there was no evidence of the amount of legitimate income Lewellen earned in his homebuilding business. Without that evidence, it is impossible to evaluate whether the money he was spending was inconsistent with the money he was earning. For that reason, the characterization of Lewellen's wealth after 1999 as "unexplained" was improper.

Any error, however, was not a plain error warranting retrial. Most of the evidence introduced was admissible on a different theory of relevance: excessive cash. Large amounts of cash may be relevant because they "show[] co-conspirators were involved in a large-scale [drug] conspiracy." *United*

*States v. Duran*, 407 F.3d 828, 837 (7th Cir. 2005) (alteration in original and internal quotation marks omitted); *see also United v. States Chavis*, 429 F.3d 662, 669–70 (7th Cir. 2005) (large amount of cash relevant evidence of drug conspiracy).

Lewellen's use of large amounts of cash was independently relevant as evidence of his involvement in a drug conspiracy, especially in light of the fact that witnesses testified that his use of the cash in the particular circumstances was unusual. *See United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles."). Therefore, any error in admission of cash evidence on a theory of unexplained-wealth did not prejudice Lewellen.

There are a few pieces of evidence the government introduced, however, that are not cash: Lewellen's $1.2 million down payment on land to build a subdivision; his company's ownership of a $125,000 excavator; and the value of the cars he purchased that was not in cash. Additional evidence about Lewellen's business, namely, that he also wrote checks for hundreds of thousands of dollars, was elicited by Lewellen in support of his argument that any cash he was spending was a small portion of his company's purchases.

Any erroneous admission of the other financial evidence did not prejudice Lewellen. In fact, it supports Lewellen's theory that he ran a successful business venture with legitimate, high-value transactions. Lewellen argued this point in closing. Because the jury was able to evaluate the probative value of Lewellen's wealth, we find that any improperly admitted evidence of non-cash expenditures could not have impacted the verdict.

*H. Out-of-Court Identification of Sparkman*

Sparkman argues that the district court improperly admitted Avila's identification because the identification was impermissibly suggestive.

Avila, a kidnapping victim, testified at trial but did not identify Sparkman in court as his assailant. Instead, the government introduced Exhibit 376, a photo array of six African-American males that Avila was shown in December 2009. Avila testified that he initialed the photo of the man who entered his home. Avila's initials in Exhibit 376 appeared on a photo of Sparkman.

After Avila testified, the government recalled Officer Healy to describe the circumstances of Avila's identification. Officer Healy testified that he interviewed Avila in December 2009 and showed him photo spreads to "see if he could identify any of the offenders in the home invasion or the prior incidents." (Trial Tr. 4458.) Sparkman objected to the testimony, arguing that it was hearsay and improper bolstering.

The district court overruled the objections, on the condition that Officer Healy not testify that Avila identified Sparkman. Officer Healy then testified that he assembled the photo spreads using driver's license photos and mug shots of persons that looked like Sparkman and told Avila to initial a photo if he recognized it to be the individual who entered his home.

Sparkman argues both that the photo array itself should have been suppressed because it is unduly suggestive and that Officer Healy's testimony about the photo array was inadmissible hearsay and improper bolstering.

Although we review a district court's interpretation of the law and rules of evidence *de novo*, its ultimate decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Rogers*, 587 F.3d 816, 819 (7th Cir. 2009).

*1. Admission of the Photo Array*

On appeal, Sparkman argues that the photo array was unduly suggestive in violation of due process. *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977). But Sparkman has waived (and not merely forfeited) any argument about the suggestiveness of the photo array because he did not file a "motion to suppress" the photo array prior to trial. Fed. R. Crim. P. 12(b)(3)(C); *United States v. Acox*, 595 F.3d 729, 733–34 (7th Cir. 2010).

Sparkman attempts to distinguish *Acox* on the grounds that *Acox* involved in-court testimony about the illegal out-of-court identification, whereas here, he was objecting to the photo array itself. That is irrelevant.

The operative question is whether Sparkman's objection is in fact a "motion to suppress." *Acox*, 595 F.3d at 733. As *Acox* makes clear, a "motion to suppress" is any objection outside the Rules of Evidence:

> Nothing in the Rules of Evidence allows a court to reject relevant, inculpatory evidence seized from the defendant's home, heard during a wiretap, based on his confession, or derived from a lineup. In order to have such evidence excluded, a defendant must rely on some norm that is outside the Rules of Evidence. That's the line between motions to suppress, which must be made before trial, and objections, which may be made during trial.

*Id.*

On appeal,[9] Sparkman's objection to the photo array is not an objection based on the Rules of Evidence; it is one based on due process. Therefore, it is a "motion to suppress" that had to be filed prior to trial. Fed. R. Crim. P. 12(b)(3)(C).

That is not the end of the inquiry, however, because the district court may still consider an untimely motion "if the party shows good cause." Fed. R. Crim. P. 12(c)(3). Sparkman did not make any motion to the district court about the allegedly suggestive identification, nor did he develop a record as to whether there was good cause for not making the motion before trial. Thus, we may only review "whether, if a motion for relief had been made and denied, the district court would have abused its discretion in concluding that the defense lacked good cause." *Acox*, 595 F.3d at 732. In other words, we must place ourselves in the district court's place at the time the evidence was introduced and determine whether, at that time, good cause existed to excuse Sparkman's untimeliness.

Sparkman argues that the record below establishes good cause for not filing a pretrial motion to suppress. Specifically, he argues that "trial counsel was apparently confused about Exhibit 376 having only six people in it when Avila was shown many more photos including some of people of different races … than Sparkman. … Trial counsel was clearly surprised by Exhibit 376 and neither the judge nor the prosecutor argued that this objection should have been raised in a motion to suppress …." (Sparkman's Reply Br. 3–4.)

---

[9] Sparkman objected to the photo array at trial, but not on the ground that the photo array was "unduly suggestive."

But Sparkman's argument is a mischaracterization of the record. Sparkman's counsel did not indicate surprise at the existence of Exhibit 376. He never said he was unaware of the exhibit or that he did not know Avila was shown a photo array of six African-American men.

Rather, his objection was for a lack of foundation necessary to admit the exhibit. The objection arose from the following testimony:

> Q: Now, in December of 2009, did agents from the DEA come and speak to you about what happened at your house?
>
> A: Yes.
>
> Q: And at that time did they show you a series of photographs of African-American men?
>
> A: They showed me a lot of pictures of different races, I think.

(Trial. Tr. 3830.)

When the government sought to introduce the exhibit of only African-American males, Sparkman objected. During a sidebar, he explained the basis for his objection:

> [Sparkman]: The point is that they have not established that they showed him separately some kind of an array of African-Americans. All he said is he saw a bunch of photos, over 120.

(*Id.* at 3832.)

After continued discussions during sidebar, the following occurred:

> The Court: … We know he was shown an array of only African-Americans.

> [Sparkman]: We don't know that.
>
> The Court: Otherwise there would have been a motion to suppress.
>
> [Sparkman]: *He was not asked that question.*
>
> The Court: And you say he has to be asked that question?
>
> [Sparkman]: I think he should be. He said he saw 120 photos.

(*Id.* at 3836 (emphasis added).)

Sparkman was not objecting on the grounds that he was unaware of the exhibit, but rather on the ground that the witness had not testified that he was separately shown an array of six African-American men—a proper trial objection based on lack of foundation.

An objection on other grounds does not establish good cause for not filing a motion to suppress the photo array because of its undue suggestiveness. Because Sparkman does not direct us to any other evidence in the record to establish good cause for not filing the motion to suppress before trial, we cannot say that the district court would have abused its discretion in denying it at trial as untimely.

*2. Officer's Testimony about the Out-of-Court Identification*

We turn now to Sparkman's argument that Officer Healy's testimony about the circumstances of Avila's identification is inadmissible hearsay and improper bolstering.

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Officer Healy's testimony about

assembling the photo array is not hearsay because it is not an "out-of-court statement." Officer Healy was simply recounting his own conduct in creating the photo array, namely that he "used driver's license photos or mug shots …" and "[t]ried to find pictures that were similar to the—our suspect." (Trial Tr. 4468.) There is no "out-of-court statement" contained therein; these are statements Officer Healy made *in* court.

There are, however, two out-of-court statements. Officer Healy testified that he "[t]old [Avila] that the person who or persons who entered his house may or may not be in this group of photos." (*Id.*) Officer Healy also testified that he told Avila "[t]o put his initials on the photo." (*Id.*)

Despite being out-of-court statements, these are not hearsay because they are not being used "to prove the truth of the matter asserted." In fact, neither of these statements can even *be* true or false. That is because "an order … is not capable of being true or false, and thus it is not offered for the truth of any matter asserted." *United States v. Keane*, 522 F.2d 534, 558 (7th Cir. 1975); *see also United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996) ("In fact, the statement by [the declarant] was not even a factual one; it was a request or an order that did not actually assert anything. It could not be hearsay, since it made no assertion of fact that could be true or false."). Instead, the statements are used for the purpose of showing that Officer Healy *gave* the instructions in order to rebut Sparkman's insinuation that Officer Healy conducted a suggestive identification procedure.

Sparkman, however, places great weight on the fact that by saying that he told Avila "[t]o put his initials on the photo" and by showing Exhibit 376 with Avila's initials on it, it was the functional equivalent of Officer Healy testifying that Avila

told him the perpetrator was Sparkman—an assertion admitted for its truth. (Trial Tr. 4468.)

But Federal Rule of Evidence 801(d)(1)(C) excludes from hearsay a statement where "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement … identifies a person as someone the declarant perceived earlier." Therefore, even if Officer Healy *had* testified that Avila said Sparkman was the perpetrator, his testimony would be excluded from hearsay under 801(d)(1)(C). All that the rule requires is that the declarant testifies and is subject to cross-examination, which Avila was, and that the statement is one of identification, which this was.

Contrary to Sparkman's argument, there is no per se requirement in Rule 801(d)(1)(C) that the witness "forgets, or changes, his testimony at trial." *United States v. Foster*, 652 F.3d 776, 788–89 (7th Cir. 2009) (internal quotation marks omitted). Rather, a witness being unable to make an identification at trial is just one example of a common circumstance in which Rule 801(d)(1)(C) is invoked. *See United States v. Brink*, 39 F.3d 419, 426 (3d Cir. 1994) (noting that "*[g]enerally*, evidence is admitted under Rule 801(d)(1)(C) when a witness has identified the defendant in a lineup or photospread, but forgets, or changes, his testimony at trial" (emphasis added)). That does not mean, however, that there is an extra-textual requirement that the witness *actually* forgets or changes his identification. No such requirement exists. [10]

---

[10] Sparkman argues that testimony about the identification could not be admitted under Rule 801(d)(1)(C) because the identification was impermissibly suggestive. Sparkman points to *United States v. Kaquatosh*, 242 F. Supp. 2d 562 (E.D. Wis. 2003), for support. In that case, the district court

Sparkman also argues that permitting Officer Healy to tes-tify about the circumstances surrounding Avila's identifica-tion amounts to improper bolstering. "Bolstering is the prac-tice of offering evidence solely for the purpose of enhancing a witness's credibility before that credibility is attacked. … Once a witness's credibility has been attacked, however, the non-attacking party is permitted to admit evidence to rehabil-itate the witness." *United States v. Lindemann*, 85 F.3d 1232, 1242 (7th Cir. 1996) (citation and internal quotation marks omitted).

The testimony admitted in this case from Officer Healy was not improper bolstering of Avila's identification testi-mony. Rather, Officer Healy's testimony was to specific facts within his own personal knowledge—his creation of the photo array and the instructions he gave. Even assuming that describing facts within his knowledge enhanced Avila's cred-ibility, it was not improper bolstering because Avila's credibil-ity—namely, his ability to identify the perpetrator—had been attacked. The defense on cross-examination had already tried to show that Avila's memory was faulty and that he had changed his descriptions. Officer Healy's testimony was used

---

indicated that Rule 801(d)(1)(C) is limited to identifications that are not impermissibly suggestive to "prevent Rule 801(d)(1)(C) from becoming an end run around the constitutional standards governing pre-trial identifi-cations." *Id.* at 564.

Sparkman's reliance on *Kaquatosh* misses the point. Sparkman never es-tablished that there was an impermissibly suggestive photo array because he did not file a motion to suppress the photo array before trial, at which time the suggestiveness (or lack thereof) would have been adjudicated. *Kaquatosh* instead stands for the obvious proposition that Rule 801(d)(1)(C) cannot be used to override a valid motion to suppress, a mo-tion Sparkman waived.

to rehabilitate Avila's identification by rebutting the defense's insinuation that the identification procedure was suggestive.

Moreover, the district court did not abuse its discretion in concluding that the probative value of Healy's description of how he prepared the photo array was substantially out-weighed by unfair prejudice, in particular given the defense's attempts to discredit Avila's identification from the photo array. *See* Fed. R. Evid. 403.

*I. Validity of Cardena's Convictions*

Cardena argues that there was insufficient evidence to sustain his convictions, in part because the district court im-properly admitted (1) his offer to cooperate with law enforce-ment and (2) statements of co-conspirators. Because Car-dena's evidentiary challenges are without merit, we find that the evidence was sufficient to sustain his convictions.

Cardena was charged with narcotics conspiracy and nar-cotics possession arising from his participation in the Joliet robbery. Co-conspirator Flores was the main witness against him. Flores testified that in 2006, Hector called him and told him to meet him in Joliet and "come ready" with Cardena. (Trial Tr. 2095.) At the meeting, Hector and Jorge told Flores, Cardena, and Sparkman that they were watching and in-tended to rob a "house that has drugs in it." (*Id.* at 2096.)

Flores testified that they did commit the robbery. Flores said he went to the front door, while Cardena and the other co-conspirators went around the back of the house. Finding the house empty, Cardena entered through the back door and let Flores in the front door. The group searched the house and found fifteen boxes filled with plastic-wrapped cocaine. They loaded the boxes into their vehicle and left.

Based on information from Flores, law enforcement went to interview Cardena for the first time on April 8, 2010. They told Cardena they were investigating kidnappings and cocaine theft from the Joliet house. Agent Reynolds and Officer Healy testified that Cardena said he did help steal cocaine from the Joliet house by loading the boxes into the vehicle. Cardena initially agreed to cooperate. Later that same day, he called the officers and told them that he was interested in cooperating, but that his lawyer had advised him not to talk to them. Phone records confirm that Officer Healy and Cardena spoke that evening.

It was not until January 3, 2011, that Cardena encountered law enforcement again. This time, they went to his house to arrest him. Agent Reynolds testified that after placing Cardena under arrest, Cardena "asked if there was information that he could provide regarding other individuals that may help him." (Trial Tr. 4493.)

### 1. Admissibility of Cardena's Offer to Cooperate

Cardena moved *in limine* to bar evidence of his post-arrest question to Agent Reynolds, in which he asked if he could help himself by providing information about the others. The district court denied the motion.

We review a district court's interpretation of the rules of evidence *de novo*, but we review its ultimate decision to admit or exclude evidence for an abuse of discretion. *Rogers*, 587 F.3d at 819.

Cardena argues that his question to the officer is hearsay that does not fall within the exception to hearsay for a state-

ment against penal interest. Fed. R. Evid. 804(b)(3). He contends that a statement intended to "curry favor" with the government is not a statement against penal interest.

Cardena's reliance on Rule 804(b)(3) is misplaced. His offer to cooperate is a non-hearsay statement of a party opponent admissible under Rule 801(d)(2)(A), which does not include any requirement that the statement be inculpatory. As we have explained before, statements admitted under Rule 801(d)(2)(A) "need neither be incriminating, inculpatory, against interest, nor otherwise inherently damaging to the declarant's case. Rule 801(d)(2)(A) simply admits those statements made by one party, but offered as evidence by the opposing party." *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000). Cardena's offer to cooperate was a statement made by him offered against him by the opposing party, and therefore was admissible under Rule 801(d)(2)(A) as a statement of a party opponent.

Cardena also argues that his post-arrest offer to cooperate should have been excluded because it was not relevant. Fed. R. Evid. 401 & 402. It appears that we have not yet held that offers to cooperate are relevant evidence tending to show consciousness of guilt. *See United States v. Lowis*, 174 F.3d 881, 884–85 (7th Cir. 1999) (declining to evaluate whether offers to cooperate are relevant as consciousness of guilt). Three sister circuits that have considered the question have concluded that an offer to cooperate is probative of consciousness of guilt. *See United States v. McCauley*, 715 F.3d 1119, 1126 (8th Cir. 2013); *United States v. Levy*, 578 F.2d 896, 901–02 (2d Cir. 1978); *United States v. Galloway*, 274 F. App'x 241, 248 (4th Cir. 2008).

We agree with our sister circuits: an offer to cooperate to get oneself out of trouble is relevant evidence tending to show

consciousness of guilt. *See* Fed. R. Civ. P. 401. Cardena's question asking if he could help himself by giving information about the others tends to show that Cardena was somehow involved in the criminal activity. Admitting to having information about the crime and attempting to help himself after he had already been arrested implies some level of involvement in the crime.

Relevance, however, is not the end of the inquiry because relevant evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. The district court did not abuse its discretion in admitting the evidence. Cardena's offer to cooperate is quite probative of his involvement in criminal activity because a person who is innocent of all wrongdoing would not likely make an offer to cooperate in exchange for getting himself out of trouble. Cardena has also not explained how there is any danger of unfair prejudice resulting from the admission of the statement; it is relevant, probative, and is not emotionally charged like the typical evidence excluded under Rule 403. *See United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986). Thus, we conclude that the district court did not abuse its discretion in admitting it.

*2. Co-Conspirator Statements Against Cardena*

Cardena[11] also argues that the district court erred in its admission of co-conspirator statements against him.

---

[11] In his brief, Hector "adopt[ed]" this argument, which is contained in Cardena's brief. To the extent that the challenge is applicable to both Defendants—*i.e.,* the district court's alleged failure to make a clear ruling—we will address it. Most of Cardena's argument, however, relates solely to his unique factual situation.

Before trial, the government filed a *Santiago* proffer outlining the co-conspirator statements it intended to use at trial. Fed. R. Evid. 801(d)(2)(E); *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987). The proffer summarized the conspiracies, the crimes committed in furtherance of the conspiracies, and co-conspirator statements the government intended to introduce against particular Defendants.

Cardena responded to the proffer, arguing that his role in the conspiracy was not adequately explained and noting that the only statements that the government listed regarding Cardena was the testimony of Flores regarding the 2006 Joliet robbery. After recounting the statements, Cardena wrote: "If the Court were to grant the government's request to use co-conspirator statements as evidence against Cardena, it should be limited to these specific statements." (R. 546 at 2.) His primary contention in his response was that the court would need to provide a limiting instruction for co-conspirator statements about any other crimes.

On November 14, 2011, the district court held a hearing on the proffer and stated:

> Let's talk about *Santiago*. I am going to tell you what problems I found with the *Santiago* presentation. And you can assume that if I don't point something out as a problem, I found that the government presented enough evidence to meet its initial *Santiago* burden.

(Hr'g Tr. 190–91, Nov. 14, 2011.)

The court then discussed its two reservations about the proffer and excluded only co-conspirator statements against

Lewellen from 1996 to 1998. No Defendant requested a more definitive ruling on the *Santiago* proffer.

At trial, Flores testified about the Joliet robbery, including the conversation in which Hector and Jorge told Cardena that they wanted to rob a "house that has drugs in it." (Trial Tr. 2096.) Cardena did not object to Flores's testimony.

In his post-trial motion for a new trial, Cardena argued that the district court did not make a clear ruling on the *Santiago* proffer. The district court rejected that argument:

> With regard to the *Santiago* proffer, the court discussed the issues it had with the proffer at length with counsel …. The record establishes that all of the parties understood the proffer to have generally been accepted, save for those particular issues that the court raised in a hearing on the matter. … To the extent that the court did not enter a formal written ruling on the *Santiago* proffer, there is no harm to Cardena. The co-conspirator statements admitted into evidence were adequately supported by proof of the conspiracies to which they related.

(R. 1063 at 1.)

Generally, we review a district court's factual findings with respect to a *Santiago* proffer made pursuant to Rule 801(d)(2)(E) for clear error. *Alviar*, 573 F.3d at 540. Defendants, however, did not object on the grounds that there was not a clear ruling on the *Santiago* proffer, so we review that issue for plain error. *See United States v. Stephenson*, 53 F.3d 836, 843 (7th Cir. 1995).

Federal Rule of Evidence 801(d)(2)(E) deems a statement to not be hearsay if it is "offered against an opposing party [and] … was made by the party's coconspirator during and in

furtherance of the conspiracy." District courts must make a preliminary determination of admissibility of co-conspirator statements. *See Bourjaily*, 483 U.S. at 175.

This court has approved doing so through the use of a pretrial *Santiago* proffer. With a *Santiago* proffer, a district court may "conditionally admit coconspirator statements" if the government makes a showing that it can and will meet the requirements for admissibility during trial. *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999). If, however, after the government rests, it "has not met its burden to show that the statements are admissible, the defendant can move for a mistrial or to have the statements stricken." *Id.*

Cardena's first claim is that the district court did not rule on the *Santiago* proffer at all. That claim is meritless. The district court made an oral ruling on the *Santiago* proffer, which is not improper. *See United States v. Yoon*, 128 F.3d 515, 525 (7th Cir. 1997) (reviewing oral *Santiago*-proffer ruling). The district court informed the parties that it "found that the government presented enough evidence to meet its initial *Santiago* burden," with the exception of a few issues, which the court then discussed. (Hr'g Tr. 190–91, Nov. 14, 2011.) The court's ruling was clear, was reiterated on multiple occasions, and was relied upon by Defendants during trial. Moreover, Cardena never asked for a clarification of the ruling. *See United States v. Downs*, 230 F.3d 272, 274 (7th Cir. 2000) (rejecting argument that ruling was unclear where the defendant "never asked the court for clarification").

Cardena's second challenge on appeal is that admission of Flores's testimony was improper because Agent Reynolds's testimony that Cardena told him he had participated in the

Joliet robbery was insufficient to corroborate Flores's testimony.

We find no error in the district court's admission of Flores's testimony against Cardena. Agent Reynolds's testimony that Cardena offered to cooperate is admissible and corroborates Cardena's participation. Coconspirator Flores testified that he, along with Cardena, Hector, and Jorge, robbed the house in Joliet for cocaine. The evidence at trial was sufficient to find that a conspiracy existed, that Cardena, Hector, Jorge, and Flores were members, and that the statements were made during and in furtherance of the conspiracy. *Bourjaily*, 483 U.S. at 175.

### 3. Sufficiency of the Evidence to Convict Cardena

Finally, Cardena challenges the sufficiency of the evidence to sustain his convictions, arguing that the government did not present evidence to prove that he conspired to commit robbery of a *controlled substance*.

When "reviewing a challenge to the sufficiency of the evidence, we view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Khattab*, 536 F.3d 765, 769 (7th Cir. 2008) (internal quotation marks omitted). We will not "weigh the evidence or second-guess the jury's credibility determinations." *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006) (internal quotation marks omitted).

We have already established that co-conspirator statements and testimony about Cardena's offer to cooperate were

admissible evidence. The remaining question is whether it was sufficient to support Cardena's conviction.

A conspiracy charge pursuant to 21 U.S.C. § 846 requires the government to prove beyond a reasonable doubt that (1) "a conspiracy existed" and (2) the "defendant knowingly and willfully participated" in it. *Smith v. United States*, 133 S. Ct. 714, 719 (2013). To establish knowing and willful participation, "[t]he government must put forth substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014) (internal quotation marks omitted). In the context of a narcotics conspiracy, the government must prove the defendant knew "that the substance in question is a controlled substance." *Id.*

Cardena does not spend much time arguing that the government did not prove that a conspiracy existed and that he knowingly and willfully participated in it. The evidence is sufficient to support that conclusion. Flores's testimony that the group agreed to rob the house in Joliet and did rob the house in Joliet demonstrates the conspiracy's existence. Flores's testimony is corroborated by Cardena's own acknowledgment to the officers that he participated in the Joliet robbery.

Instead, Cardena primarily argues that the evidence was insufficient to prove that he knew they were stealing *cocaine*. We disagree. The evidence is sufficient to find that he knowingly and willfully participated in a conspiracy to steal cocaine. Flores testified that at the in-person meeting Hector and Jorge told the group they would be robbing a house that had

drugs in it, and that they did find cocaine in the house. Deficiencies in Flores's testimony were fully explored and argued to the jury.

Moreover, Agent Reynolds testified that he had no doubt that Cardena told him he participated in stealing boxes of cocaine from the house in Joliet. The fact that Agent Reynolds did not include the mention of "cocaine" in his first interview report was argued to the jury.

The testimony adduced at trial was sufficient for a rational juror to find beyond a reasonable doubt that Cardena knowingly and willfully participated in a narcotics conspiracy. Cardena was told before the robbery they were looking for drugs, and Cardena admitted to law enforcement that he helped steal cocaine. The credibility of Flores's and Agent Reynolds's testimony was before the jury, and it found them to be credible.

*J. § 924(c) Convictions in Light of* Johnson v. United States[12]

Defendants Jorge, Hector, and Sparkman argue that their convictions on counts 8 and 11 for using a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A), must be reversed in light of *Johnson v. United States*, 135 S. Ct. 2551 (2015). We disagree.

Although *Johnson* itself had not been decided at the time of Defendants' trials, Defendants could have raised the issue. They did not, meaning that "our review is for plain error." *United States v. Hurlburt*, No. 14-3611, 2016 WL 4506717, at *2

---

[12] Defendants requested supplemental briefing on this issue after the case was argued. We granted the motion on July 12, 2016.

(7th Cir. Aug. 29, 2016). To correct a forfeited error, a defendant must prove that (1) there was an error; (2) the error was plain; (3) the error affected the defendant's substantial rights; and (4) the error "seriously impugn[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010).

The first step in our analysis is to answer whether there was an error. *Johnson* held that the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague in violation of the Due Process Clause. 135 S. Ct. 2551 at 2557. That provision defined "violent felony" as:

> [A]ny crime punishable by imprisonment for a term exceeding one year … that—
>
> > (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*

18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added). The residual clause allowing conviction for conduct that "presents a serious potential risk of physical injury to another" is, the Supreme Court held, unconstitutionally vague. *Johnson*, 135 S. Ct. at 2557.

Defendants' convictions were under 18 U.S.C. § 924(c), which prohibits use of a firearm during a crime of violence. The term "crime of violence" for purposes of that section is defined as:

[A]n offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) *that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*

§ 924(c)(3) (emphasis added). Subsection (B) is virtually indistinguishable from the clause in *Johnson* that was found to be unconstitutionally vague. 135 S. Ct. at 2557.

Moreover, in *United States v. Vivas-Cejas*, 808 F.3d 719, 721 (7th Cir. 2015), we applied *Johnson* and found that it invalidated the residual clause in 18 U.S.C. § 16(b), which defined a crime of violence to include "a felony that, *by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*" The clause invalidated in *Vivas-Cejas* is the same residual clause contained in the provision at issue, 18 U.S.C. § 924(c)(3)(B). Accordingly, we hold that the residual clause in 18 U.S.C. § 924(c)(3)(B) is also unconstitutionally vague.

Having decided that subsection (B) is unconstitutionally vague, we must then decide whether Defendants' convictions actually violated *Johnson*. For if their underlying convictions "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person or property of another," they may be sustained under subsection (A). *See Dawkins v. United States*, 809 F.3d 953, 954 (7th Cir. 2016).

The crime of violence underlying Defendants' § 924(c) convictions was kidnapping in violation of 720 ILCS 5/10-1,

5/10-2. In determining whether the statute qualifies as a crime of violence, we apply the "categorical approach" and look to the statutory definition to see whether the elements of the offense satisfy § 924(c)(3)(A). *See Taylor v. United States*, 495 U.S. 575, 600 (1990).

The Illinois kidnapping statute provides:

> (a) A person commits the offense of kidnapping when he or she knowingly:
>
> > (1) and secretly confines another against his or her will;
> >
> > (2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or
> >
> > (3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will.

720 ILCS 5/10-1. The third section—by "deceit or enticement"—does not have the use, or threatened use, of force as an element, undoubtedly taking it outside of the scope of § 924(c)(3)(A).

In such situations, courts have sometimes applied the modified categorical approach to statutes that list alternative "elements" of committing the offense. In the modified categorical approach, courts may look to so-called *Shepard* material to discern which alternative element supported the defendant's conviction. As the Supreme Court's recent opinion in *United States v. Mathis*, 136 S. Ct. 2243 (2016), makes clear, where there is a disjunctive state statute, the court must be

careful to distinguish "elements"—which "the jury must find beyond a reasonable doubt to convict"—and "alternative means"—which are "various factual means of committing a single element." *See id.* at 2248–49. The former type of statute would be divisible because it lists elements in the alternative, thus defining multiple crimes. *Id.* at 2249.

Here, the statute is divisible. The Illinois kidnapping statute does not list multiple elements with separate methods of satisfying each element; rather, the statute lists three separate ways of committing kidnapping. The Illinois appellate court has referred to subsections (a)(1), (a)(2), and (a)(3) as three "theories" of kidnapping, each with its own constituent "elements" that must be found by the jury. *People v. Robinson*, No. 1-13-0484, 2016 WL 3384989 (Ill. App. Ct. 2016). In that case, the prosecution chose to charge a particular theory, thereby taking on the burden of proving that theory. The interpretation of Illinois kidnapping as divisible is consistent with Illinois's model jury instructions, which suggests that the jury should be instructed on the particular theory applicable to the case and that the jury must find the elements of the particular theory beyond a reasonable doubt. See Ill. Pattern Jury Instr. 8.02.[13]

---

[13] The jury instructions for aggravated kidnapping also presuppose charging a particular theory of kidnapping. *See* Ill. Pattern Jury. Instr. 8.04, committee note ("The underlying offense of kidnapping can be committed in one of three ways: (1) secret confinement (see Section 10-1(a)(1)); (2) carrying another by force or threat of imminent force (see Section 10-1(a)(2)); or (3) inducing travel by deceit or enticement (see Section 10-1(a)(3)). When the defendant *is charged under* Section 10-1(a)(1), give this instruction and Instruction 8.05. When the defendant *is charged under* Section 10-1(a)(2), give this instruction and Instruction 8.05A. When the defendant *is*

Use of the *Shepard* documents, as opposed to looking merely to the elements in the statute, does not help the government. The relevant *Shepard* documents, here the charging documents and the jury instructions, do not establish which "theory" of kidnapping Defendants were alleged to have committed.

The district court instructed the jury:

> Under Illinois law, a person commits the offense of kidnapping when he or one for whose conduct he is legally responsible, one, knowingly and secretly confines the individual against his will, or, two, knowingly and by force or threat of imminent force carries the individual from one place to another with intent secretly to confine that person against his will or, three, knowingly and by deceit or enticement induces another person to go from one place to another place with intent secretly to confine the person against his will."

(Trial Tr., vol. 30B, 5448.)

Under that instruction, there is no way to determine that Defendants were convicted of an offense that "has as an element the use, attempted use, or threatened use of physical force" where there are alternative means of satisfying the kidnapping offense—*e.g.*, by deceit or enticement—that do not require the use of force. When a jury is instructed on alternative theories of guilt, one of which is legally invalid, and returns a general verdict—as it did here—a plain error occurs. *Yates v. United States*, 354 U.S. 298, 318–327 (1957), *overruled on*

---

*charged under* Section 10-1(a)(3), give this instruction and Instruction 8.05B." (emphasis added)).

*other grounds by Burks v. United States*, 437 U.S. 1 (1978); *see also Hurlburt*, 2016 WL 4506717, at *3 ("[P]lain-error review asks whether the error is 'plain' at the time of appellate review … .")

But even a jury-instruction error of constitutional dimension is subject to the familiar requirement that the error have harmed the defendant. *See Skilling v. United States*, 561 U.S. 358, 414 (2010) (noting that a jury instruction error of the *Yates* variety is subject to harmless-error review); *Hedgpeth v. Pulido*, 555 U.S. 57, 60 (2008) (same). In other words, to constitute reversible error, the plain error must have affected the defendant's substantial rights such that there is a reasonable probability that but for the error the outcome of the trial would have been different. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016); *United States v. McGuire*, No. 15-2071, 2016 WL 4527557, at *2 (7th Cir. Aug. 30, 2016). The analysis "requires the same kind of inquiry" as harmless-error review, except that the burden is on the defendant to show prejudice. *United States v. Olano*, 507 U.S. 725, 734 (1993). Defendants have not satisfied their heavy burden of showing that the error affected their substantial rights. *United States v. Butler*, 777 F.3d 382, 388 (7th Cir. 2015) (calling the plain error test "remarkably demanding").

An error will not be a "plain error" calling for appellate intervention, despite the lack of an objection, if the trial court or opposing party could have easily fixed the problem in response to a timely objection and the outcome was unlikely to have been different. *See, e.g.*, *United States v. Ridley*, 826 F.3d 437, 443 (7th Cir. 2016); *United States v. Harvey*, 484 F.3d 453, 458 (7th Cir. 2007) (two issues); *United States v. Tejeda*, 476 F.3d 471, 474–75 (7th Cir. 2007). A timely objection here would

have allowed the government to propose more specific jury instructions narrowing the kidnapping theory to the theory under Illinois law that includes "force or threat of imminent force," which satisfies the elements clause in section 924(c)(3)(A). As we explain in the following paragraphs, if the jury had been instructed on only that narrower theory, it would still have convicted Jorge, Hector, and Sparkman on counts 8 and 11 for using a firearm during a crime of violence.

Count 8 charged Defendants with kidnapping Avila and his family while carrying a firearm. Although the count 7 conviction for the Avila kidnapping involved the disjunctive Illinois kidnapping jury instruction, Defendants have not shown a reasonable probability that the outcome would have been different had the jury been instructed only under the Illinois kidnapping provision that has as an element the use or threatened use of force. Defendants tried to kidnap Avila three times. During the successful attempt, Defendants carried guns and broke down Avila's back door with a battering ram. Defendants ordered Avila's family to stay in a back room and when they left, they warned Avila's family that if they called the police, Defendants would return. Avila himself testified that one Defendant ordered him to the ground and put a gun to Avila's head during the kidnapping. Although Defendants relied in part on their police officer disguises to get the victims' to comply, to win on appeal, Defendants have to do more than show "any possibility, no matter how unlikely, that the jury could have convicted based exclusively on" a nonviolent prong of the Illinois kidnapping statute. *United States v. Marcus*, 560 U.S. 258, 263, 266–67 (2010) (internal quotation marks omitted). They have not done so.

Count 11 charged Defendants with kidnapping Carranza while carrying a firearm. Again, the Illinois kidnapping statute read to the jury does not necessarily have as an element the use or attempted use of force. As with count 8, however, Defendants have failed to show a reasonable probability that the outcome would have been different had the jury been properly instructed that the kidnapping be committed by force or threat of force. The only testimony about the Carranza kidnapping came from Carranza himself. He testified that Defendants broke down his door, pointed a gun at him, and ordered him to get on the floor. As Defendants left his house, they forced Carranza into a back room and told him that if he left they would shoot him. Because Carranza's testimony had to have been the "sole basis for the jury's verdict," Defendants have not shown a reasonable probability that the outcome of the proceeding would have been different but for the error. *See United States v. Cureton*, 739 F.3d 1032, 1046 (7th Cir. 2014).

Because plain error is a difficult standard to meet and because of the extensive evidence showing that the kidnappings at issue involved the use or threatened use of force, Defendants' have not shown that there is a reasonable probability that the outcome of the proceeding would have been different with a proper jury instruction. Accordingly, we affirm Defendants' convictions under § 924(c)(3).

*K. Consideration of Co-Conspirators' Sentences for Jorge*

We turn now to the sentencing challenges. Jorge argues that the district court committed a procedural error in sentencing him because it did not adequately address his argument that there were "unwarranted sentence disparities" between him and the sentences given to his co-conspirators.

Because we are vacating Jorge's sentence, we do not dwell on whether there was any error in the district court's consideration of co-conspirators' sentences. We do, however, offer two brief clarifications.

On appeal, Jorge compares his sentence with those of the other Defendants who went to trial and were convicted. To the extent Jorge argues there was an unwarranted disparity between his sentence and Hector's or Lewellen's, the district court could not have erred by failing to consider those sentences, which had not yet been imposed at the time of Jorge's sentencing. *See United States v. Sanchez*, 710 F.3d 724, 732–33 (7th Cir. 2013) (no error in not considering not-yet-imposed sentence of co-defendant), *vacated on other grounds by Sanchez v. United States*, 134 S. Ct. 146 (2013).

We also wish to clarify that in considering whether there are any "unwarranted sentence disparities" pursuant to 18 U.S.C. § 3553(a)(6), a district court *may* consider the sentences imposed on cooperating co-conspirators. *See United States v. Jones*, 792 F.3d 831, 834–35 (7th Cir. 2015). But the rule only prohibits sentence disparities that are *unwarranted*. It is within the district court's discretion to determine whether the disparity is warranted in light of the co-conspirator's cooperation.

*L. Second or Subsequent § 924(c) Conviction*

Next, Defendants Jorge, Hector, and Sparkman argue that the district court erred in imposing a 25-year consecutive mandatory minimum for a "second or subsequent" 21 U.S.C. § 924(c) firearm offense because (1) the offenses were in the same indictment and (2) second or subsequent was found by the judge, not the jury.

*1. Same Indictment*

Defendants argued to the district court that it could not impose a second or subsequent § 924(c) conviction because there was no "interval of punishment" between the two offenses. The district court rejected that argument as foreclosed by our precedent.

We review the district court's interpretation of § 924(c) *de novo*. *United States v. Cureton*, 739 F.3d 1032, 1040 (7th Cir. 2014). Defendants acknowledge, however, that their argument is foreclosed by *Deal v. United States*, 508 U.S. 129, 134 (1993).

*Deal* rejected the argument that a second or subsequent § 924(c) conviction can only be imposed if the second firearm offense occurred after the first conviction. *Id.* at 131–34. There is no requirement of separate indictments or an interval of punishment. We have reiterated that conclusion many times. *See, e.g.*, *United States v. Cheshier*, 39 F. App'x 335, 336–37 (7th Cir. 2002); *United States v. Luney*, 17 F. App'x 424, 425 (7th Cir. 2001). Defendants argue that *Deal*'s holding should be rejected. They are free to ask the Supreme Court to do so.

*2. Second or Subsequent Not Found by Jury*

Defendants did not argue to the district court that second or subsequent had to be found by the jury. Therefore, we review for plain error. *United States v. Kirklin*, 727 F.3d 711, 717 (7th Cir. 2013).

There was no error, however, because Defendants' argument is foreclosed by *Almendarez-Torres v. United States*, which held that recidivism is not an "element" of an offense, and so it need not be found by a jury. 523 U.S. 224, 244–47 (1998).

We have previously "recognize[d] that there is some tension between *Alleyne* and *Almendarez-Torres*," but we leave that tension "for the Supreme Court to resolve." *United States v. Lomax*, 816 F.3d 468, 477–78 (7th Cir. 2016).

*M.* Alleyne *Error: "Brandish" Not Found By Jury*

We turn to the final argument on appeal. In light of *Alleyne v. United States*, 133 S. Ct. 2151 (2013), Defendants Jorge, Hector, and Sparkman argue that they were improperly subjected to a 7-year mandatory minimum on count 8 for brandishing a firearm where the jury only convicted them of using or carrying a firearm. We agree.

Hector and Jorge raised this argument to the district court in anticipation of *Alleyne*, preserving *de novo* review. *Lomax*, 816 F.3d at 477. Sparkman, however, did not raise the issue, triggering review for plain error. *Cureton*, 739 F.3d at 1045.

*Alleyne* held that because a finding of brandishing increases the mandatory minimum, it is an "element" of the offense that must be found by the jury. 133 S. Ct. at 2155, 2162–63. There is no doubt that it was error under *Alleyne* to impose a mandatory minimum of 7 years for "brandishing" where the jury only convicted of "use," which has a 5-year mandatory minimum.

But the government argues that the *Alleyne* error does not constitute a miscarriage of justice (or is harmless) because it is "highly unlikely a jury would have convicted on a § 924(c) count but acquitted [the defendant] of brandishing." *Cureton*, 739 F.3d at 1045–46. We disagree.

"Brandish" means to "display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person." 18 U.S.C.

§ 924(c)(4). The government relies on the testimony of Flores and Avila to establish that the guns were brandished.

Flores testified that he, Sparkman, Jorge, and Hector planned to raid Avila's home dressed as police officers. Flores testified that he and Hector "brought the guns" and "had [their] guns drawn while [Sparkman] broke the door down." (Trial Tr. 2130.) While outside Avila's door, there were no people to intimidate. It is unclear from Flores's testimony what the group did with the guns after they entered the house and found Avila's family. We cannot say that this testimony establishes that Defendants displayed the firearm in order to intimidate another person, especially in light of the fact that Flores testified that they used their authority as "police officers"—not their firearms—to ensure the victims' compliance.

The government also relies on Avila's testimony that after he heard his daughter scream, he went upstairs, and a man "put a gun to [his] head." (Trial Tr. 3837.) Avila identified this assailant in a photo array as Sparkman, but he did not identify Sparkman at trial. We think this case is distinguishable from *Cureton*. In *Cureton*, the *only* testimony presented as to the existence of guns was that the defendant "put the gun up to [the witness's] head." 739 F.3d at 1046. The jury convicted the defendant of a § 924(c) offense on that testimony alone. *Id.* In this case, however, we have overwhelming testimony from Flores that establishes that Defendants *carried* guns, but only limited evidence of brandishing—the testimony from Avila who did not identify the assailant at trial. For that reason, we cannot reliably say it is highly unlikely the jury could have convicted of use but acquitted of brandishing.

The government also argues that any error "had absolutely no effect" on Hector's and Jorge's sentences because

they were sentenced above the mandatory minimum. *See United States v. Bethany*, 569 F. App'x 447, 452 (7th Cir. 2014). We disagree. Hector and Jorge were both subject to an advisory guideline range of life, but the district court did not give either of them a life sentence, instead choosing to depart downward significantly.

For Jorge, the district court departed downward from the guidelines range of life to 28 years and then imposed the 7-year and 25-year consecutive mandatory minimums, for a total term of imprisonment of 60 years. For Hector, the district court departed downward from life to 18 years and then imposed the consecutive 7-year and 25-year mandatory minimums, for a total term of 50 years' imprisonment. Because the mandatory minimum of 7 years went into the district court's determination of their ultimate sentences, we cannot say that the *Alleyne* error was harmless.

We note that this case is unusual because it is not often that the guidelines range is only life imprisonment. It appears that what the district court did, in effect, was treat the mandatory minimum as a lower bracket for purposes of deciding what sentence to give Defendants and then sentenced them in between 42 years and life.[14] For that reason, too, we cannot say that lowering the mandatory minimum by 2 years would have "absolutely no effect" because the district court would be considering a range of 40 years to life. Therefore, Jorge and

---

[14] That fact distinguishes this case from those where the mandatory minimum was originally below the guidelines range, the guidelines range does not change, and the district court thought a within-guidelines sentence was appropriate. *See United States v. Bethany*, 569 F. App'x 447, 452 (7th Cir. 2014). In such an instance, lowering the mandatory minimum would not affect the district court's choice of a within-guidelines sentence.

Hector are entitled to resentencing in light of this *Alleyne* error.

Finally, with respect to Sparkman, the mandatory minimum had an enormous effect on his sentence because he *was* sentenced to the mandatory minimum. The district court expressed distress at the length of the sentence, noting: "I think the sentence provided by the mandatory minimums in this case is … in my view it's excessive." (Sparkman Sent. Tr. 17.) Therefore, we find that the *Alleyne* error was plain, affected his substantial rights, and the failure to correct it could result in a miscarriage of justice.

Accordingly, Defendants Hector, Jorge, and Sparkman are entitled to resentencing with the mandatory minimum on count 8 reduced to 5 years.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the convictions of all Defendants. We VACATE the sentences of Tony Sparkman, Jorge Uriarte, and Hector Uriarte on count 8 and REMAND for resentencing consistent with this opinion.