The Hon. Josephine L. Staton, United States District Judge
This matter is before the Court on two defense motions. The first moves to dismiss Counts 1-3, 5-7, and 9-10 based on a statute of limitations issue that arises out of the sealing of the Indictment for 3 months. (Doc. 40, "SOL Motion"; see also Doc. 52 (sealed Opposition), Doc. 54 (in camera Habben Declaration), and Doc. 58 (Reply).) The second motion seeks dismissal of counts 9-10 of the Indictment, arguing that the Travel Act charges are not properly supported by the state-law predicate alleged in the Indictment. (Doc. 43, "Travel Act Motion"; see also Doc. 56 (Opposition) and Doc. 59 (Reply).)
As set forth below, the Court DENIES both motions.
I. Background
Defendant Tiffany Rogers is an orthopedic surgeon who performed spinal surgeries and who was indicted as part of the Drobot/Pacific Hospital kickback conspiracy/fraud scheme. (See generally Doc. 1, Indictment.) Defendant is alleged to have received kickbacks in exchange for referrals of patients needing spinal surgeries and other procedures. (Indictment ¶ 16(a)-(k).)[1] The Indictment alleges Defendant is associated with kickbacks totaling $35,000. (¶ 18.) The payments were allegedly disguised as payments pursuant to a bogus contract entered into for the purposes of concealing the kickback payments. (¶ 16(h)-(j).)
Based on these allegations, Defendant is charged with conspiracy, mail and wire fraud involving deprivation of honest services, and violations of the Travel Act by the use of a facility of interstate commerce in aid of an unlawful activity.[2] The overt acts in furtherance of the conspiracy alleged in the Indictment range from June 21, 2012 through April 4, 2013. (Indictment at 5 & 9-13.) The substantive offenses range from April 2, 2013 through July 3, 2013. (Id. at 14-19.) The Indictment was filed on March 21, 2018. (Id. )
The Indictment was sealed the same day it was filed. (Doc. 4.) In sealing the Indictment, the Magistrate Judge relied on the Government's Ex Parte Application to Seal ("Application"). (Doc. 3.) The Application purported to incorporate an "attached declaration"
*780 of the prosecutor, but no declaration was attached. (See generally id. ) The Indictment remained sealed until June 21, 2018, when the Magistrate Judge unsealed it at the request of the Government. (Docs. 11-12.)
II. SOL Motion to Dismiss
Defendant moves to dismiss Counts 1-3, 5-7, and 9-10 as untimely. The Government contends the statute of limitations was tolled from the time the Indictment was filed under seal to the time the seal was lifted, that is, from March 21, 2018 to June 27, 2018 ("the seal period").
A. Statute of Limitations and Sealed Indictments
The limitations period as to all counts is five years. 18 U.S.C. § 3282(a). "Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment." United States v. Pacheco , 912 F.2d 297, 305 (9th Cir. 1990) (citations omitted). However, sealed indictments toll the limitations period from the date of the return of the indictment only if that indictment was sealed for "legitimate prosecutorial objectives." United States v. Bracy , 67 F.3d 1421, 1426 (9th Cir. 1995). Otherwise, the tolling period begins with the indictment's unsealing.
In this case, if the Indictment was sealed and maintained under seal for legitimate prosecutorial objectives, then no count is barred by the statute of limitations. However, if the Indictment was not maintained under seal for any legitimate prosecutorial objective, or if its unsealing was unreasonably delayed, then only Counts 4 and 8 are timely.[3]
B. Legitimate Prosecutorial Objectives
Where the limitations period expires on charges in an indictment under seal, the Government bears the burden of establishing its sealing serves legitimate prosecutorial objectives. See, e.g. , United States v. Srulowitz , 819 F.2d 37, 41 (2d Cir. 1987) (explaining that "the government, if challenged, must demonstrate legitimate prosecutorial purposes for the secrecy of the indictment"). The Government contends that legitimate prosecutorial objectives in this case tolled the statute of limitations during the seal period. Specifically, the Government describes an ongoing criminal investigation and the ongoing involvement of cooperating witnesses, including covert activity by those witnesses. These reasons were not proffered by the Government when it sought the Magistrate Judge's Order to seal the Indictment, and although the Government referred to a declaration intended to be offered in support of the seal application, the declaration was (presumably inadvertently) omitted.
However, as the Court held previously in a related case, the question of whether a sealed indictment tolls the limitations period is determined by a consideration of the record after a defendant challenges the sealing, which is necessarily after the seal is lifted. See United States v. Gross , 370 F.Supp.3d 1139, 1143-46 (C.D. Cal. 2019). Therefore, the Court focuses on the current record to determine whether maintaining the Indictment under seal served legitimate prosecutorial objectives.
Here, the Government describes two related legitimate prosecutorial objectives that were served by the sealing of the Indictment. First, the Government presents *781 evidence that there was an ongoing criminal investigation. (See Opp. at 15-20; Habben Decl. ¶¶ 6-9 & Ex. B (describing the ongoing investigation, activities, and actual and anticipated results).)[4] Second, the Government presents evidence that the ongoing investigation included continuing covert activity by cooperating witnesses. (See Opp. at 23-25; Habben Decl. ¶¶ 10-19 & Ex. C.)
Defendant argues that the investigation into related charges against her or against alleged co-conspirators was not a legitimate basis to seal the existing charges against her. (SOL Mot. at 7-12.) Defendant argues that tolling the limitations period based on investigation of related charges gives the Government the ability to unfairly circumvent the limitations period to serve its own "investigative convenience," to avoid triggering the Speedy Trial Act deadlines, and to otherwise deprive the accused of the benefit of the limitations period. (Id. at 11.) Defendant relies upon cases holding that the limitations period is not tolled while the Government continues to investigate conduct not yet charged but that could lead to related charges against the accused. See, e.g., United States v. Gigante , 436 F. Supp. 2d 647, 658 (S.D.N.Y. 2006) ("Whatever the legitimate prosecutorial purposes are that justify the sealing of an indictment, surely they do not include the need for additional time to decide whether to bring an additional charge."); see also United States v. Stehl , No. CR 12-995 ABC, 2013 WL 12170491, at *8 (C.D. Cal. Nov. 27, 2013) (citing Gigante ). Defendant argues that this authority, developed where the Government continued to investigate a defendant whose indictment was under seal, applies with even greater force to continued investigations into a defendant's alleged co-conspirators. (SOL Mot. at 8-9.)
In the Ninth Circuit, however, the investigation of related charges constitutes a legitimate prosecutorial objective justifying the sealing of an indictment. See Bracy , 67 F.3d at 1426-27 (finding no abuse of discretion where district court relied on, inter alia , "the ongoing nature of [the Government's] investigation into" a related illegal organization to toll the limitations period of charges in a sealed indictment as to four individual defendants). Indeed, Stehl did not determine that an ongoing investigation could not provide the basis for maintaining an indictment under seal, but rather that the government had failed to offer any evidence as to why its ongoing investigation took as long as it did. See 2013 WL 12170491, at *9.
Here, the Government has provided evidence that sealing the Indictment promoted the legitimate prosecutorial interest in protecting the integrity of the evidence related to the investigation. The Government points out that unsealing the Indictment gives rise to the duty to disclose discovery that can include the statements of alleged co-conspirators and witnesses regarding the matters still under investigation. The case agent explains the danger associated with a witness's exposure to others' statements. (See Habben Decl. ¶ 9.)
Likewise, facilitating the ongoing covert activity by cooperating witnesses described by the Government is a legitimate prosecutorial objective. (See Opp. at 23-25; Habben *782 Decl. ¶¶ 10-19.) As Agent Habben recounts, the more public the Pacific Hospital investigation became, the less effective the covert activity became. (Id. ¶¶ 11, 16-17 & 19.) He also notes that the efficacy of covert activity experienced an uptick during the seal period. (Id. ¶ 14.)
Moreover, as noted by the Court at the hearing, this case arises out of a much larger investigation involving many defendants who either engaged in or are alleged to have engaged in complicated financial transactions and contractual arrangements specifically designed to cover up illegal conduct. The participants in this scheme are alleged to have set up entire systems of deceit to cover up the primary deceit. The participants devised sophisticated means of distributing the illegal profits of their scheme and obscuring the illicit nature of the kickback payments. With this level of planning and sophistication on the part of the defendants, the Government's continued interest in limiting the release of information about the ongoing investigation was legitimate, and its continued caution was understandable.[5]
In sum, the Government has met its burden of establishing that sealing the Indictment served legitimate prosecutorial objectives.
C. Effect of Delay After Unsealing of Indictments Charging Alleged Co-Conspirators
Defendant argues that even if sealing the Indictment served a legitimate prosecutorial objective at the time it was sealed, that justification ended before the Indictment was unsealed. (SOL Mot. 22-25.) Defendant contends that the Government unreasonably delayed in seeking to unseal the Indictment, and this delay requires dismissal of the challenged counts of the Indictment. (Id. ) Once there is no longer a legitimate prosecutorial objective that is served by maintaining an indictment under seal, the Government must take steps to have it unsealed. United States v. Benavides , No. CR 06-62-M-DWM, 2009 WL 10679152, at *10 (D. Mont. Dec. 15, 2009) (collecting cases). A time line of events is helpful to the Court's consideration of the issue:
06/21/2012 Beginning of the conspiracy (relating to Defendant). (Indictment at 5.)
04/04/2013 Last overt act alleged in the Indictment. (Indictment at 13.)
06/27/2013 Operative date for Count 4, Honest Services/Mail Fraud. (Indictment at 15.)
07/03/2013 Operative date for Count 8, Honest Services/Wire Fraud. (Indictment at 17.)
03/21/2018 Indictment filed and sealed. (Docs. 1 & 4.)
04/11/2018 Alleged co-conspirator Tantuwaya arrested and his indictment unsealed. (United States v. Tantuwaya , Case No. SACR 18-00040-JLS (Docs. 12 & 15).)
05/18/2018 Indictments of alleged co-conspirators Payne and Gross unsealed. (United States v. Payne , Case No. SACR 17-00053-JLS (Doc. 20); United States v. Gross , Case No. SACR 18-00014-JLS (Doc. 12).)
*783 06/21/2018 Government sought unsealing of Defendant's Indictment, effective 06/27/2018. (Doc. 11.)
06/25/2018 Indictments of alleged co-conspirators Hunt and Hammer unsealed. (United States v. Hunt and Hammer , Case No. SACR 17-00742-JLS (Doc. 21).)
06/21/2018 Defendant's Indictment unsealed, effective 06/27/2018. (Doc. 12.)
06/28/2018 Two alleged co-conspirators charged (Information not sealed). (United States v. Capen , Case No. SACR 18-00124-JLS (Doc. 1); United States v. Papa , Case No. SACR 18-00125-JLS (Doc. 1).)
07/12/2018 Indictment of two alleged co-conspirators returned (never sealed). (United States v. Tauber and Obukhoff , Case No. SACR 18-00140-JLS (Doc. 1).)
07/17/2018 Indictment of two alleged co-conspirators unsealed. (United States v. Carrico and Parker , Case No. 18-00120-JLS (See Doc. 11 & unenumerated docket entry of same date).)
Defendant argues that the justification for maintaining the Indictment "evaporated" when the indictment of alleged co-conspirator Tantuwaya was unsealed on April 11, 2018 and, if not then, the justification most certainly disappeared when the indictment charging alleged co-conspirators Gross and Payne was unsealed on May 18, 2018. (SOL Mot. at 22-25.)
The Court has already rejected the argument that the unsealing of Defendant Tantuwaya's indictment significantly weakened the justification for maintaining the indictments of other alleged co-conspirators under seal. Gross , 370 F.Supp.3d at 1145 ("Nevertheless, the Government ... can choose to ... make some general representations regarding an ongoing investigation, or even to release some specific details thereof, without incurring the duty to make all the details public.").
As to the May 18, 2018 unsealing of the indictment of Gross and Payne, the same rationale applies. The Government's decision to make additional charges public does not compel the same decision as to Defendant. The legal standard requires only that maintaining the Indictment under seal serves a legitimate prosecutorial objective. Moreover, as to Defendant Rogers, the record reflects a more specific reason for maintaining the Indictment under seal after other indictments were unsealed on May 18, 2018. (See Habben Decl. Ex. A (in camera ) (entries from June 2018).) In examining the record, the Court finds that the sealing of the Indictment served a legitimate prosecutorial objective until at least the date of its unsealing on June 27, 2018.
The cases cited by Defendant do not convince the Court otherwise. (See SOL Mot. at 22-25; SOL Reply at 7-9.) Notably, those cases deal with months-long delays. More specifically, Defendant's reliance on United States v. Watson is misplaced because ultimately, the delay was found to be justified by a legitimate prosecutorial objective.[6] Defendant also relies on *784 United States v. Deglomini , 111 F.Supp.2d 198, 200 n.1, 203 (E.D.N.Y. 2000). There, the court held that an unjustified fourteen-month delay by the prosecution required dismissal. Id. at 200 (noting that the government admitted to being "hard pressed to justify the fact that the case agent took fourteen months to arrest the defendants"). Benavides found an eighteen-month delay unreasonable. 2009 WL 10679152 at *13 ("Tolling the statute is not a legitimate prosecutorial purpose, and the 18-month delay in unsealing the charges was unreasonable."). Gigante dealt with the continued sealing of an indictment where "[f]our superseding indictments were filed over the course of ... twenty-one months." 436 F. Supp. 2d at 649.
No lengthy delay is present here. Indeed, the Government took prompt steps to ensure the Indictment was unsealed less than three weeks after the events referenced above. (See Habben Decl. Ex. A (in camera ) (entries from June 2018).)
D. Prejudice to Defendant
Defendant correctly notes that courts may dismiss even a properly sealed indictment where a defendant has established prejudice. (See SOL Reply at 7-8); see, e.g., United States v. Wright , 343 F.3d 849, 859 (6th Cir. 2003) ("[C]ourts have held that a defendant must show 'substantial, irreparable and actual prejudice' when a properly sealed indictment is unsealed beyond the statute of limitations."); United States v. DiSalvo , 34 F.3d 1204, 1218-19 (3d Cir. 1994) (noting that where an indictment is properly sealed, the defendant must "demonstrate actual prejudice to be entitled to dismissal of the indictment"); United States v. Edwards , 777 F.2d 644, 649 (11th Cir. 1985) ("Courts have dismissed indictments maintained under seal beyond the limitation period only upon a showing of substantial, irreparable, actual prejudice to the defendants."); Muse , 633 F.2d 1041, 1043 (2d Cir. 1980) ("We think the defendant's interests are adequately protected by permitting him to secure dismissal only when he can show prejudice occurring during the period when the indictment was sealed, or perhaps only during the post-limitations portion of that period."); Benavides , 2009 WL 10679152 at *12 ("Courts are in general agreement that a defendant seeking the dismissal of a properly sealed indictment must demonstrate actual prejudice.").
In her Motion, however, Defendant does not offer any suggestion that she suffered the prejudice generally associated with a delay in prosecution, and instead disavows the intent to establish prejudice based on an adverse impact in her ability to defend against the charges. (See SOL Reply at 1 ("Dr. Rogers is not ... contending that the sealing of her indictment was illegitimate because she was 'prejudiced' in preparing her defense.").) This is unsurprising, given the fact that defense counsel had been in contact with the Government regarding the possibility of charges being filed against Defendant since mid-2014. (Doc. 40-2, Cohen Decl. ¶ 2.)
Defendant instead posits a novel form of harm suffered as a result of the Government's actions: She contends the prosecution violates the separation-of-powers doctrine by attempting to circumvent the legislature's limits-imposed via the statute of limitations found in 18 U.S.C. § 3282(a) -in a manner that "strikes at the Constitution's division of power between the executive and the legislature." (SOL Reply at 1 & 6-7; SOL Mot. at 10-11.)
*785 As the Court understands Defendant's argument, she contends that the prosecution, as part of the Executive Branch, "intrude[s] upon the central prerogatives of" the Legislative Branch by attempting to circumvent the limitations period enacted by the Legislative Branch. (SOL Mot. at 11 (quoting Loving v. United States , 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ).)
The prosecutor's actions in this case are not of the type that violate the separation-of-powers doctrine. An action by the prosecutor that gives rise to a violation of the legal rights of the accused does not constitute an impermissible encroachment by the Executive Branch on the prerogative of the Legislative Branch to make laws. Here, as a check on the power of the Executive Branch, the accused has moved the Court to determine whether the prosecutor has stayed within the bounds of the law in the exercise of his duties. Therefore, presently before the Court is the ordinary question of whether an action by the prosecutor in the role of enforcing the nation's laws has infringed upon the legal right of the accused conferred upon her by a statute enacted by Congress. In this manner, all three branches of the government of the United States are functioning exactly as intended, each well within its routine role and established boundaries, and all at work within the heart of the symbiotic structure envisioned by the framers of the Constitution. (See U.S. Const. art. 1, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States ....); Loving , 517 U.S. at 758, 116 S.Ct. 1737 (the office of the Chief Executive is "designed for the prompt and faithful execution of the laws and its own legitimate powers"); Marbury v. Madison , 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").
Defendant's novel argument based on the separation-of-powers doctrine does not establish the type of prejudice that requires dismissal of Counts 1-3, 5-7, and 9-10 of the Indictment.
Therefore, as discussed herein, the Government has established legitimate prosecutorial objectives for maintaining the Indictment under seal until the date of its unsealing on June 27, 2018. Moreover, in light of Defendant's knowledge of the Government's investigation into her alleged involvement in the present scheme, Defendant has failed to establish she suffered the type of prejudice that could require dismissal of the Indictment. Accordingly, the Court DENIES the Motion to Dismiss Counts 1-3, 5-7, and 9-10 of the Indictment.
III. Travel Act Motion
Defendant also seeks dismissal of Counts 9-10, which charge violations of the Travel Act, arguing that the allegations regarding an element of the charged offenses is deficient. Specifically, Defendant argues that certain state-law offenses identified in the Indictment cannot serve as the basis for the Travel Act charges because, applying the now-familiar "categorical approach," these statutes are overbroad. As discussed below, the Court concludes that the categorical approach does not apply to Travel Act predicates.
A. Legal Standard for Dismissal of Indictment
An indictment must set forth the elements of the charged offenses. United States v. Bernhardt , 840 F.2d 1441, 1445 (9th Cir. 1988). The charges must be set forth "in sufficient detail (1) to enable the defendant to prepare [her] defense; (2) to ensure [her] that [s]he is being prosecuted on the basis of the facts presented to *786 the grand jury; (3) to enable [her] to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge." Id. The allegations of the indictment are presumed to be true. Id. at 1445-46. "An indictment that tracks the words of the statute violated is generally sufficient [if] implied, necessary elements, not present in the statutory language, [are] included in [the] indictment." United States v. Jackson , 72 F.3d 1370, 1380 (9th Cir. 1995) "[T]he issue ... is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." United States v. Buckley , 689 F.2d 893, 897 (9th Cir. 1982).
B. Use of Interstate Facility in Aid of Unlawful Activity ("Travel Act Violation")
The Travel Act provides that "[w]hoever ... uses the mail or any facility in interstate or foreign commerce[ ] with [the] intent to ... carry on ... an[ ] unlawful activity," and thereafter performs or attempts to perform "an act" of "unlawful activity," violates the Travel Act and is guilty of a crime. 18 U.S.C. § 1952(a). The definition of "unlawful activity" includes different types of crimes: The Travel Act targets activities taken in connection with organizations involving illegal gambling, illegal liquor distribution, controlled substances, and prostitution. 18 U.S.C. § 1952(b). It also targets activities related to extortion, bribery, arson, money laundering, monetary transactions related to unlawful activities, and certain violations of financial reporting requirements. Id.
Relevant to this case, the statutory definition of "unlawful activity" includes "bribery ... in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b)(2). Bribery, in this context, is broadly defined to be "the generic definition of bribery," described as "includ[ing] payments to private individuals to influence their actions." Perrin v. United States , 444 U.S. 37, 45-46 & 49, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). Thus, the Travel Act's prohibition against bribery reaches "all relations which are recognized in a society as involving special trust [that] should be kept secure from the corrupting influence of bribery." See id. at 45 n.11, 100 S.Ct. 311.
Therefore, to be guilty of a Travel Act violation, a defendant must use a facility of interstate commerce (or travel across state lines), with an intent to engage in any one of a broad number of unlawful activities, and thereafter must engage in an unlawful activity. In this particular case, the unlawful activity Defendant is alleged to have engaged in is receipt of kickbacks in violation two separate provisions of California law. The Government contends these violations fall into the Travel Act's prohibition against "bribery ... in violation of the laws of the State in which committed." 18 U.S.C. § 1952(b)(2). Defendant disagrees.
C. Kickbacks Prohibited Under California Law
The Indictment identifies California Business and Professions Code § 650 (" § 650") and California Insurance Code § 750 (" § 750") as the bases for the Travel Act element of "unlawful activity." (¶¶ 18-20.) California Business and Professions Code § 650 bars medical professionals from receiving compensation in exchange for patient referrals. California Insurance Code § 750(a) has a similar prohibition that applies to those involved in medical or insurance claims processing. These statutes criminalize the payment of referral fees or, more colloquially, they criminalize "kickbacks." The Court has previously *787 held that these provisions prohibit "bribery" as that term is used in the Travel Act. Gross , 370 F.Supp.3d at 1149-50.
Referring to the descriptions of what constitutes "bribery" according to the Supreme Court in Perrin , this Court noted:
The kickbacks at issue here fit within these descriptions. A "kickback," at least in the context of this case, is a particular type of bribe. In fraud cases involving medical billing, these bribes are often characterized as "rebates" or "referral fees," but in substance, the payments are illegal monetary incentives meant to induce a person, often a doctor, to use his or her position of trust to influence another, often the patient, for the purpose of financially benefitting a third party because that third party has agreed to pay the influencer a portion of revenue generated by the referral. This type of monetary incentive easily falls into the generic definition of bribery of "payments to private individuals to influence their actions."
Gross , 370 F.Supp.3d at 1149-50 (quoting Perrin , 444 U.S. at 45, 100 S.Ct. 311 ).
Defendant disagrees with the conclusion reached in Gross , arguing that the Court is required to apply the "categorical approach" to determine if the offenses referred to in § 650 and § 750 are a categorical match for the generic offense of "bribery" as contemplated by the Travel Act.
D. Legal Standard for Categorical Approach
The categorical approach was articulated by the Supreme Court in Taylor v. United States , 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), and Descamps v. United States , 570 U.S. 254, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013). The categorical approach applies to determine whether conviction on a specific offense constitutes a predicate offense supporting, generally, application of a sentencing enhancement (such as the Armed Career Criminal Act) or an offense with collateral immigration consequences (such as removal). See Rendon v. Holder , 764 F.3d 1077, 1083 n.5 (9th Cir. 2014).
The relevant inquiry has three steps. Medina-Lara v. Holder , 771 F.3d 1106, 1111-12 (9th Cir. 2014). First, courts "ask whether the statute of conviction is a categorical match to the generic predicate offense; that is, if the statute of conviction criminalizes only as much (or less) conduct than the generic offense." Id. at 1112 (citing Taylor , 495 U.S. at 600, 110 S.Ct. 2143 ). In doing so, courts effectively "presume that the conviction rested upon ... the least of th[e] acts" criminalized by the state statute. Moncrieffe v. Holder , 569 U.S. 184, 190-91, 133 S.Ct. 1678, 185 L.Ed.2d 727 (2013) (citation omitted). If there is a categorical match, that is, if the least of the acts criminalized match the generic offense, consideration of the other steps is unnecessary, and the statute of conviction constitutes a predicate offense. Medina-Lara , 771 F.3d at 1112. If there is no categorical match, the statute of conviction is considered "overbroad," further consideration is necessary, and courts proceed to the second and third steps. Id.
In step two, courts determine whether the overbroad statute is "divisible." Id. A statute is divisible where it "lists multiple, alternative elements, and so effectively creates several different ... crimes." Descamps , 570 U.S. at 264, 133 S.Ct. 2276 (quotation marks omitted). Divisibility depends on whether a statute's "listed items are elements or means." Mathis v. United States , --- U.S. ----, 136 S.Ct. 2243, 2256, 195 L.Ed.2d 604 (2016). Where the listed items do not define crimes with differing elements, those *788 listed items may simply be different means (that is, different ways) of committing the same crime. Determining whether listed items are elements or means may be answered in a number of ways, including: by a state court decision; by whether the statute specifies differing punishments (in which case they are elements) or specifies illustrative examples (in which case they are means); or by whether the statute specifies "which things must be charged (and so are elements) and which need not be (and so are means)." Mathis , 136 S. Ct. at 2256. Where the distinction cannot be made by these methods, courts may look to the indictment, jury instructions, plea colloquy, and/or plea agreement (the so-called " Shepard documents") to make the divisibility determination.[7] Mathis , 136 S. Ct. at 2256-57 ; Shepard v. United States , 544 U.S. 13, 25-26, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). If the statute is not divisible, the inquiry ends, there is no categorical match, and the statute of conviction does not constitute a predicate offense. Medina-Lara , 771 F.3d at 1112 ("[A] conviction under an indivisible, overbroad statute can never serve as a predicate offense.") (emphasis in the original).
If the statute is divisible, step three requires that a comparison be made between the elements of the (now properly "divided") statute of conviction and the elements of the generic offense. Id. Termed the "modified categorical approach," if the comparison of this step results in a categorical match, the statute of conviction, properly divided, constitutes a predicate offense. Id. at 1112-13.
E. "Contemporaneous Conduct" and the Categorical Approach
In the Motion, Defendant posits that the Court must employ the categorical approach to determine whether § 650 and § 750 are "chargeable under the Travel Act." (Travel Act Mot. at 3.) Thereafter, Defendant argues that § 650 and § 750 are both overbroad and cannot serve as Travel Act predicates. (Id. at 4-10.) The cases upon which Defendant relies did not use the categorical approach. (See Travel Act Opp. at 10-13.) In the Reply, it becomes clear that Defendant argues by analogy that the categorical approach should be applied to Travel Act predicate offenses. (See generally Travel Act Reply.) Specifically, although the categorical approach is most familiar to courts when prior convictions must be considered for sentencing or immigration purposes, Defendant argues that courts have also routinely applied the categorical approach to cases in which contemporaneous conduct is relevant in some manner.
As an example of the application of the categorical approach to contemporaneous conduct, Defendant offers the firearm-related offense that enhances the sentence for persons who are convicted of "any crime of violence." (See Reply at 1 (referring to 18 U.S.C. § 924(c) ).) Specifically, § 924(c) enhances the sentence of any person who carries or uses a firearm "during and in relation to any crime of violence." 18 U.S.C. § 924(c)(1)(A). In relevant part, "crime of violence" is defined as "an offense that is a felony and [that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (referred to as "the elements clause" or "the force clause"). Generally, in the charging document, a § 924(c) violation is a contemporaneously *789 but separately charged offense. See, e.g., United States v. Lopez , No. 119CR00014DADBAM, 2019 WL 2077031, at *1 (E.D. Cal. May 10, 2019) (charged in same indictment with attempted armed bank robbery); United States v. Mobley , 344 F. Supp. 3d 1089, 1092 (N.D. Cal. 2018) ( § 924(c) tried concurrently with assault on a federal officer with a deadly or dangerous weapon); United States v. Dorsey , No. 2:14-CR-00328(B)-CAS, 2016 WL 3607155, at *1 (C.D. Cal. June 30, 2016) (charged in same indictment with Hobbs Act robbery). Although the § 924(c) offense is charged contemporaneously with the underlying purported "crime of violence" (or "predicate offense"), courts uniformly apply the categorical approach to determine whether the predicate offense meets the "crime of violence" definition. See e.g., United States v. Piccolo , 441 F.3d 1084, 1086-87 (9th Cir. 2006) ("[I]n the context of crime-of-violence determinations under § 924(c), our categorical approach applies ...."); United States v. Hendricks , 921 F.3d 320, 327 (2d Cir. 2019) ("To determine whether a crime is a 'crime of violence' under § 924(c)(3)(A), we apply the so-called 'categorical approach.' "); United States v. Simms , 914 F.3d 229, 242 (4th Cir. 2019) (noting that "[t]he Government concedes that § 924(c)(3)(A) ... mandates a categorical approach"); United States v. Jefferson , 911 F.3d 1290, 1296-99 (10th Cir. 2018) (applying categorical approach to determine whether Hobbs Act robbery was a "crime of violence"); United States v. St. Hubert , 909 F.3d 335, 347-51 (11th Cir. 2018) (same), cert. denied , --- U.S. ----, 139 S. Ct. 1394, 203 L.Ed.2d 625 (2019) ; United States v. Bowens , 907 F.3d 347, 353 n.10 (5th Cir. 2018) (same), cert. denied , --- U.S. ----, 139 S. Ct. 1299, 203 L.Ed.2d 421 (2019) ; United States v. Douglas , 907 F.3d 1, 9 n.12 (1st Cir. 2018) ("[W]e have held in several cases that a categorical approach properly applies to the force clause at § 924(c)(3)(A) ...."); United States v. Cardena , 842 F.3d 959, 996 (7th Cir. 2016) (applying categorical approach); Rowe v. United States , No. 17-CV-0784-CAS, 2017 WL 6885601, at *5-6 (C.D. Cal. Nov. 3, 2017) (same); United States v. Figueroa , No. 12CR236-GPC, 2017 WL 3412526, at *7 (S.D. Cal. Aug. 9, 2017) (same); United States v. Baires-Reyes , 191 F. Supp. 3d 1046, 1049 (N.D. Cal. 2016) (same). Therefore, in this manner, the Defendant is correct that the categorical approach may be applied to contemporaneous conduct or, more precisely, to contemporaneously charged offenses.
However, this example does not support application of the categorical approach in this case. The Court explains below.
F. The Purpose of the Categorical Approach is to Effectuate Congressional Intent
The Government contends that the traditional reasons for applying the categorical approach arose because the examination of predicate offenses "were largely specific to ... prior convictions." (Travel Act Opp. at 7.) In a case involving a prior conviction, the Supreme Court has observed that "[t]he categorical approach serves the practical purpose[ ]" of limiting the inquiry to elements of the offense of conviction, thereby "precluding the relitigation of [the factual basis underlying] past convictions in minitrials conducted long after the fact" and "promot[ing] judicial and administrative efficiency." Moncrieffe , 569 U.S. at 200-01, 133 S.Ct. 1678. The categorical approach indeed serves this purpose.
Nevertheless, the primary purpose of the categorical approach is to effectuate the intent of Congress. In the words of the Fourth Circuit: "Although categorical analysis may be complicated, *790 the rationale for it is simple and long-established: if Congress has conditioned a statutory penalty on commission of an offense generally-rather than on specific acts-courts must consider the crime as defined, rather than the offender's conduct." Simms , 914 F.3d at 239-40 (noting that the Supreme Court's development and application of the categorical approach "has always [been] rooted ... in the statutory language chosen by Congress.") A long line of Supreme Court precedent consistently demonstrates that congressional intent is the driving force behind the categorical approach. See Taylor , 495 U.S. at 590, 110 S.Ct. 2143 (1990) ("Nor is there any indication that Congress ever abandoned its general approach, in designating predicate offenses, of using uniform, categorical definitions to capture all offenses of a certain level of seriousness that involve violence or an inherent risk thereof, and that are likely to be committed by career offenders, regardless of technical definitions and labels under state law."); Shepard , 544 U.S. at 19, 125 S.Ct. 1254 ("Nor does the [Armed Career Criminal Act's] legislative history reveal a lesser congressional preference for a categorical, as distinct from fact-specific, approach to recognizing ACCA predicates in cases resolved by plea."); Descamps , 570 U.S. at 267-68, 133 S.Ct. 2276 ("If Congress had wanted to increase a sentence based on the facts of a prior offense, it presumably would have said so; other statutes, in other contexts, speak in just that way."); Johnson v. United States , --- U.S. ----, 135 S. Ct. 2551, 2562, 192 L.Ed.2d 569 (2015) ("This emphasis on convictions indicates that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions.") (citation omitted); Mathis , 136 S. Ct. at 2248 ("That means as to burglary-the offense relevant in this case-that Congress meant a crime containing the following elements: an unlawful or unprivileged entry into a building or other structure, with intent to commit a crime.") (citation omitted); cf. Nijhawan v. Holder , 557 U.S. 29, 38-40, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009) ("We conclude that Congress did not intend [for 8 U.S.C. § 1101(a)(43) ](M)(i)'s monetary threshold to be applied categorically, i.e. , to only those fraud and deceit crimes generically defined to include th[e $10,000 monetary loss] threshold. Rather, the monetary threshold applies to the specific circumstances surrounding an offender's commission of a fraud and deceit crime on a specific occasion.") (emphasis added).
G. Congress Intended a Conduct-Based Approach for Travel Act Violations
In contrast to the Travel Act, the language of § 924(c) clearly reveals that the intent of Congress was to make relevant the defendant's conviction of certain categories of offenses (rather than making relevant the conduct underlying those offenses). Specifically, under § 924(c)(3)(A), the "crime of violence" is defined as a felony that "has as an element the use, attempted use, or threatened use of physical force." This statutory language is unmistakable: It clearly establishes the relevant inquiry is an elements-based inquiry, not a conduct-based inquiry. See, e.g., Simms , 914 F.3d at 233 (applying the categorical approach to § 924(c)(3)(A) and stating "[t]o be more precise, we will refer to ... the elements-based categorical approach, because it begins and ends with the offense's elements.") (emphasis in the original). Indeed, the Ninth Circuit has applied the categorical approach to three different criminal statutes that use this same language. See e.g., Piccolo , 441 F.3d at 1086-87 (applying the categorical approach to the § 924(c) crime-of-violence definition);
*791 Fernandez-Ruiz v. Gonzales , 466 F.3d 1121, 1131-32 (9th Cir. 2006) (applying the categorical approach to 18 USC § 16(a)'s definition of "crime of violence," which is identical to that set forth in § 924(c) ); United States v. Parnell , 818 F.3d 974, 981 (9th Cir. 2016) (applying the categorical approach to the Armed Career Criminal Act's § 924(e)(2)(B)(i) definition of "violent felony," which is nearly identical to that set forth in § 924(c) ).
In contrast to § 924(c)(3)(A), the Travel Act does not focus on the elements of the specified offenses. Instead, the focus is on the "unlawful activity" of the defendant. Specifically, as noted previously, the Travel Act prohibits a defendant's use of a facility of interstate commerce with a specific intent, coupled with the defendant's commission of an act related to "unlawful activity." 18 U.S.C. § 1952. Most fundamentally, the Travel Act's reference to "unlawful activit[ies]" (rather than any reference to specified "elements" or "offenses") is significant, as the Travel Act's "unlawful activit[ies]" language is not conducive to application of the categorical approach, which the Simms court aptly called the "elements-based categorical approach." 914 F.3d at 233 (emphasis in the original). Indeed, the Travel Act's conduct-based definition of "unlawful activit[ies]" would seem to completely foreclose the application of the elements-based categorical approach.
However, other Travel Act language lends itself a comparison between the prohibitions of the Travel Act and the elements of state-and federal-law predicates. The Travel Act also expressly defines "unlawful activity" as
(1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances ..., or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) [violations of certain financial reporting requirements].
18 U.S.C. § 1952(b). This definition clearly evinces an intent to limit the Travel Act's applicability based on an underlying body of law including, relevant to the present case, state criminal law prohibiting bribery. Nevertheless, this particular limitation does not require application of the categorical approach for reasons unique to the Travel Act. As discussed in the next section, the Supreme Court has interpreted this language as an intent to provide a federal enforcement mechanism for conduct that violates state law.
In any event, the structure of the statute clearly requires a conduct based-approach. The conduct reached by the express definition of "unlawful activity" that is quoted above, already quite broad, is further broadened by the Travel Act's reference to a wide variety of "acts" that can be taken in furtherance of the "unlawful activity," including "(1) distribut[ing] the proceeds of any unlawful activity; ... [or] (3) otherwise promot[ing], manag[ing], establish[ing], carry[ing] on, or facilitat[ing] the promotion, management, establishment, or carrying on[ ] of any unlawful activity." Thus, the Travel Act is clearly intended to address a wide range of conduct rather than to merely address the commission of certain state-law offenses. Accordingly, the Court concludes that use of the categorical approach for state-law Travel Act predicates is not consistent with the intent of Congress.
H. The Supreme Court Twice Applied a Conduct-Based Approach to Determining Whether Certain State Law Violations Constitute Travel Act Violations
The Court also notes that this conclusion is consistent with two Supreme Court *792 cases interpreting the Travel Act. United States v. Nardello and Perrin both strongly suggest that a conduct-based approach applies to Travel Act predicates. Having preceded the development of the now-familiar categorical approach, these cases had no occasion to expressly address its applicability. Nevertheless, the focus of these cases on the conduct of the defendants rather than on the nature or elements of the relevant offenses is telling.[8]
Nardello considered whether two defendants could be prosecuted under the Travel Act for their conduct in luring individuals into compromising situations and then threatening them with exposure unless defendants' silence was purchased. 393 U.S. 286, 287, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). The defendants argued that their conduct was not "extortion" under applicable state law because laws prohibiting "extortion" required that the accused be a public official. Id. at 288, 89 S.Ct. 534. However, under the law of Pennsylvania, their admittedly extortionate conduct could be prosecuted under statutes criminalizing "blackmail." Id. at 288-90, 89 S.Ct. 534. The Court ultimately concluded that a generic definition of "extortion" was intended by Congress, and how a statute was labeled or characterized under state law was not relevant. Id. at 295-96, 89 S.Ct. 534. Thus, the Supreme Court focused on the conduct of the defendants rather than on the elements of the offense of "extortion" (or even of "blackmail") under state law. This focus was not accidental. The Court rejected defendants' narrow definition of "extortion" in favor of a broad definition proposed by the Government, the latter of which the Court believed to effectuate the intent of Congress to assist local law enforcement officials in combatting multi-state networks of organized crime. Id. at 289-296, 89 S.Ct. 534. ("In light of the scope of the congressional purpose we decline to give the term 'extortion' an unnaturally narrow reading, ... and thus conclude that the acts for which appellees have been indicted fall within the generic term extortion as used in the Travel Act.") Ultimately, the Supreme Court accepted the Government's argument "that Congress intended that extortion should refer to those acts prohibited by state law which would be generically classified as extortionate , i.e. , obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." Id. at 290, 89 S.Ct. 534 (emphasis added).
Ten years later, Perrin used the same conduct-based approach. In Perrin , the Supreme Court relied on Nardello in concluding that in enacting the Travel Act, Congress intended to incorporate "the generic definition of bribery, rather than a narrow common-law definition." 444 U.S. at 49, 100 S.Ct. 311. Because "Congress intended 'bribery ... in violation of the laws of the State in which committed' as used in the Travel Act to encompass conduct *793 in violation of state commercial bribery statutes ," the Supreme Court rejected the defendant's argument that "bribery" under the Travel Act was limited to common-law bribery involving public officials.
Without question, these cases call for an examination of the defendant's conduct. The defendant's conduct is compared both to the generic definition of "extortion" or "bribery" and to the elements of an appropriate state-law offense. Because Nardello and Perrin clearly require comparisons of the defendant's conduct, rather than a comparison of the elements of a generic offense to the elements of a predicate offense, Nardello and Perrin preclude application of the categorical approach in the manner advocated by Defendant here.[9]
I. Sufficiency of Travel Act Allegations
In this case, to sufficiently allege the element of an "unlawful activity" based on "bribery" under the Travel Act, the Government must allege conduct by Defendant that both (1) falls within the generic definition of "bribery" as identified in Perrin and (2) is in violation of the law of the state in which the activity was committed. See Perrin , 444 U.S. at 45-46 & n.11, 100 S.Ct. 311 ; Myers v. Sessions , 904 F.3d 1101, 1108 & n.4 (9th Cir. 2018). The Government has alleged both.
Here, as in Gross , the kickback arrangements alleged in the Indictment fall within the generic definition of "bribery" identified in Perrin. See Gross , 370 F.Supp.3d at 1149-50.
Moreover, the Indictment sufficiently alleges violations of California Business and Professions Code § 650 (" § 650") and California Insurance Code § 750 (" § 750") as the bases for the Travel Act element of "unlawful activity." (¶¶ 11-12.) It alleges the payment of monetary incentives intended to induce Defendant to use her position as an orthopedic surgeon to influence her patients to have surgery at Pacific Hospital for the purpose of financially benefitting Pacific Hospital, and to do so because Pacific Hospital agreed to pay the Defendant a portion of revenue generated by the referral. (¶ 16(a)-(b) & (j).) This type of monetary incentive easily falls into the generic definition of bribery of "payments to private individuals to influence their actions." Perrin , 444 U.S. at 46, 100 S.Ct. 311.
For the reasons identified, the Court DENIES the Travel Act Motion to Dismiss.
IV. Conclusion
The Court should DENIES Defendant's Motions to Dismiss.
IT IS SO ORDERED.

Hereinafter, any paragraph number citations refer to the Indictment.

Referred to as the Travel Act because it criminalizes travel in interstate commerce in connection with certain crimes, this provision of federal law also criminalizes use of a facility of interstate commerce, such as the mail, in connection with those crimes.

The parties disagree regarding whether the conspiracy count could still be timely based on overt acts other than those alleged in the Indictment. (Compare Opp. at 28-29 with Reply at 9-10.) The Court does not find it necessary to separately address this issue.

Some details of the investigation were made available to the Court in camera. A redacted version of the in camera material was made available to defense counsel. The redacted material is narrowly tailored to protect the "sources and methods" of an ongoing investigation, such as identities of persons cooperating with the Government and the manner in which they cooperated. The materials also identify targets of the investigation during the seal period.

The desire by those under investigation to acquire details relating to the criminal investigation is also borne out by the fact that a number of defendants in the related cases attempted to obtain materials regarding the ongoing criminal investigation by way of discovery in the related civil case. See State Comp. Ins. Fund v. Drobot , No. SACV130956AGCWX, 2016 WL 3546583, at *7-8 (C.D. Cal. Feb. 29, 2016) (issuing a protective order regarding investigative materials).

See United States v. Watson , 599 F.2d 1149 (2d Cir.), opinion amended on reh'g , 690 F.2d 15 (2d Cir. 1979), and opinion modified on reh'g sub nom. United States v. Muse , 633 F.2d 1041 (2d Cir. 1980) (en banc ). At issue before the panel in Watson was a lengthy delay (sixteen months) in unsealing an indictment based on the government's desire to avoid alerting two co-defendants (whose locations were unknown) to charges against them, which led to the continued sealing of the indictment as to the third defendant, Muse (whose location was known). 599 F.2d at 1154. The majority of a divided panel found that this reason was a legitimate prosecutorial objective that justified maintaining the charges against Muse under seal. Id. at 1155. Although Muse's conviction was initially vacated on rehearing due to a finding of prejudice, Watson , 690 F.2d at 17-18, the en banc Second Circuit eventually affirmed the conviction. See Muse , 633 F.2d at 1044.

A court's review of these documents is limited to determining "what the prosecutor included as elements of the crime and to what elements the petitioner pleaded guilty." Almanza-Arenas v. Lynch , 815 F.3d 469, 479 (9th Cir. 2016).

Nardello and Perrin both precede the Supreme Court's refinement of the categorical approach that began with Taylor. However, as the Simms court noted, the distinction between a conduct-based inquiry and an elements-based approach dates back over one-hundred years. See Simms , 914 F.3d at 240 (citing cases). The categorical approach, although not denominated as such, has long been applied in immigration cases to determine whether prior convictions involve "moral turpitude." See U.S. ex rel. Robinson v. Day , 51 F.2d 1022, 1022-23 (2d Cir. 1931) ("When by [an offense's] definition it does not necessarily involve moral turpitude, the alien cannot be deported because in the particular instance his conduct was immoral.... Conversely, when [the offense] does, no evidence is competent that he was in fact blameless."); United States v. Uhl , 210 F. 860, 863 (2d Cir. 1914) (noting that in determining whether a conviction is one involving moral turpitude, courts must "[c]onfin[e] the inquiry to the judgment of conviction").

At oral argument, advocating a contrary conclusion and characterizing Perrin as "the foundation of the applicability of the categorical approach," Defendant pointed out that Taylor cites to Perrin . Taylor indeed cites to Perrin , and it cites to Nardello as well. However, the Court in Taylor relied on Nardello and Perrin to establish that the use of a term in a statute need not be given its common-law meaning where Congress intended a different meaning, such as the term's "accepted contemporary meaning," which Taylor , like Nardello and Perrin , refer to as the term's "generic definition." Taylor , 495 U.S. at 593-98, 110 S.Ct. 2143 ; Perrin , 444 U.S. at 49, 100 S.Ct. 311 ; Nardello , 393 U.S. at 296, 89 S.Ct. 534. The manner in which Taylor builds upon Nardello and Perrin is limited to this discussion of the need to make an initial discernment of congressional intent regarding the generic definition of a predicate offense. Taylor does not rely on Nardello and Perrin in formulating the elements-based categorical approach.